676 A.2d 533

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BENNY
HOGAN, JR., DEFENDANT–RESPONDENT.

Argued January 29, 1996—Decided May 23, 1996.

218

*Timothy J. Moriarty*, Assistant County Prosecutor, argued the cause for appellant (*Carmen Messano*, Prosecutor of Hudson County, attorney).

*Ruth Bove Carlucci*, Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner*, Public Defender, attorney).

*Marcy H. Geraci*, Deputy Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*Deborah T. Poritz*, Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

This case presents issues concerning the existence and scope of a prosecutor's duty to present exculpatory evidence to a grand jury. After a jury trial, defendant was convicted of armed robbery, robbery, armed burglary, burglary, and possession of a weapon for an unlawful purpose. The Appellate Division reversed defendant's convictions, concluding that the trial court should have dismissed the indictment because the prosecutor had failed to present to the grand jury evidence that the State's principal witness had retracted her complaint against defendant. *State v. Hogan*, 281 *N.J.Super.* 285, 299, 657 *A.*2d 462 (1995). We granted the State's petition for certification, 142 *N.J.* 458, 663 *A.*2d 1364 (1995), and now reverse.

I

On the night of August 29, 1989, Elnora Daye was the victim of a robbery. At trial, the State contended that defendant, Benny Hogan, Jr., was one of the two men who had broken into Daye's Jersey City house and had stolen Daye's credit cards and $290 in cash.

Daye's eyewitness testimony was the foundation of the State's case. She testified that at 11:30 on the night in question, she and her four-year-old daughter were asleep in their upstairs bedrooms when Daye was awakened by noise coming from the first floor. Daye ignored the noise at first, but when she heard someone shatter the glass of a window pane, she went into her daughter's room and woke up her daughter. Daye and her daughter then sat on the top step of the stairs that separated the two stories in the house and listened to the noises made by intruders who had entered the house and were walking around in the darkness of the first floor.

Eventually, one of the perpetrators turned on the first-floor lights, and Daye saw two men standing at the bottom of the stairs. One of the men walked up the stairs while the second perpetrator, identified at trial as defendant, instructed Daye to make it easier on herself by handing over her valuables. When Daye responded

that she had no valuables, defendant repeated his demand. At that point, defendant's accomplice, who had reached the top of the stairs, pulled out a gun and placed it to the head of Daye's daughter. Daye told the men that whatever she had of value was in her pocketbook in her bedroom. Defendant walked up the stairs and entered the bedroom. He emerged moments later, and the two perpetrators left the house. As they walked out, Daye warned them that she would remember their faces.

Daye went to the window to watch the perpetrators leave her property. Defendant drove off in a car that was parked to the rear of Daye's driveway. Because of street lights in the area, Daye was able to discern the license-plate number of the car. She wrote the number on a piece of paper but subsequently lost the paper. Defendant's accomplice did not enter the car with defendant, electing instead to leave the area on foot.

Overcome with fear, Daye returned with her daughter to their seat on the top step of the stairs. They remained there awake all night, Daye clutching a knife in her hands. Daye subsequently went through her belongings and determined that defendant had stolen credit cards and approximately $290 from her pocketbook.

The day after the robbery, Daye was standing in front of her house talking to a friend when she saw defendant's car across the street. Defendant was sitting in the car. Daye asked her friend if he knew the man in the car and he answered that he had met the man in prison, and that his name was Benny Hogan. Daye's friend then approached defendant and began talking to him. Daye accompanied her friend and stared at defendant while defendant and Daye's friend spoke. Defendant soon interrupted the conversation and asked Daye why she was staring at him. When Daye accused defendant of having robbed her the previous night, defendant denied the allegation. Daye told defendant that she remembered his car and had recorded its license-plate number on a piece of paper. In response, defendant claimed that he had loaned his car to his cousin the previous night, and that he would not have done so if he had known that his cousin was planning on

robbing someone. However, Daye, who recognized a distinctive scar on the side of defendant's face, remained convinced that defendant was one of the men who had robbed her.

After her conversation with defendant, Daye went back into her house and telephoned the police. When the police arrived, Daye told them of the robbery and of her recent discussion with defendant. Daye then accompanied the officers to the police station, where she picked defendant's picture out of a book of photographs. Jersey City police officers arrested defendant the following day. Defendant's accomplice was never apprehended.

On January 12, 1990, defendant was indicted on one count of robbery and one count of burglary. Because defendant was on parole after having recently been released from prison, the Parole Board began taking steps to revoke defendant's parole and to require him to finish the sentence he had been serving for armed robbery, robbery, and possession of controlled dangerous substances.

Shortly after defendant was indicted, Daye communicated with the prosecutor's office and told an investigator that she had been threatened and harassed by defendant and his family. Then, on May 10, 1990, defendant's wife escorted Daye to the Public Defender's Office, where Daye recanted her complaint against defendant. In a taped statement, Daye denied seeing defendant in her house on the night she was robbed. When the assistant deputy public defender asked her why she originally had accused defendant, Daye explained, "Because everybody was telling me about Benny, saying the type of person he was, what he was capable of doing so it made me scared." Daye stated that she now believed defendant's claim that he had not robbed Daye and that he had loaned his car to someone else on the night of the robbery. Daye signed a largely pre-printed affidavit that stated that Daye would not object to the dismissal of the criminal charges against defendant. On the bottom of the affidavit Daye wrote, "Reason: I realize now that Mr. Hogan is not the person who committed the crimes against me."

Following Daye's recantation, two investigators from the Hudson County Prosecutor's Office met with Daye to ascertain why she had changed her story. Under oath, Daye stated that after she had filed her complaint against defendant, defendant's daughter contacted Daye and warned her, "If something happen[s] to my father then you and your daughter will get killed." Daye also had been contacted by defendant's mother, who left three notes for Daye under her door requesting to speak with her. When Daye called Mrs. Hogan, she asked Daye if she was going to proceed with the prosecution of her son, and offered Daye money to retract her complaint.

Daye explained to the investigators that on the day of the recantation, defendant's wife came to Daye's house and asked Daye to go with her to talk to a lawyer about defendant's case. Daye agreed because she was afraid of what defendant and his family might do to her. She feared that if she did not cooperate she would become "dead meat." In her statement to the investigators Daye insisted that her recantation was a lie, and that she had told defendant's wife and lawyer what they wanted to hear because Daye was afraid for herself and her child.

Daye later testified at a hearing held to determine whether defendant's parole should be revoked on the basis of the pending burglary and robbery indictment. At that hearing Daye reaffirmed her original allegations against defendant and stated that she had recanted those allegations only because of her fear of defendant and his family. She explained that she was "very worried about testifying in court and fear[ed] that someone else w[ould] come after her." The hearing officer found Daye's testimony to be credible. He noted that Daye "appeared to be outwardly frightened and began to sob and cry when reminded that she would have to testify in the presence of [defendant] in court." (This Court previously granted the State's motion to supplement the record with, among other items, the transcripts of the parole revocation hearing and Daye's post-recantation statement to the investigators from the prosecutor's office.)

A new assistant prosecutor, assigned to the case in mid–1990, decided to re-present the case to the grand jury to secure additional charges against defendant relating to the alleged robbery. On learning that the case would be returning to the grand jury, defense counsel asked the prosecutor to inform the grand jury of Daye's recantation of her original complaint. The prosecutor rejected that request and secured a second indictment against defendant on August 15, 1990. That indictment charged defendant with armed robbery, contrary to *N.J.S.A.* 2C:15–1 (Count 1); robbery, contrary to *N.J.S.A.* 2C:15–1 (Count 2); armed burglary, contrary to *N.J.S.A.* 2C:18–2 (Count 3); burglary, contrary to *N.J.S.A.* 2C:18–2 (Count 4); aggravated assault, contrary to *N.J.S.A.* 2C:12–1b (Count 5); unlawful possession of a weapon, contrary to *N.J.S.A.* 2C:39–5b (Count 6); and possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a (Count 7). The only witness to appear before the grand jury was a Jersey City police officer, who recounted to the jury the substance of Daye's original complaint against defendant.

At defendant's arraignment, defendant pled not guilty to all charges. The court dismissed the January 12 indictment, noting that it had been superseded by the August 15 indictment.

Before trial, defendant moved to dismiss the superseding indictment. Defendant argued that the prosecutor had committed misconduct in failing to present the exculpatory recantation to the grand jury. The State responded by arguing that prosecutors have no obligation to present exculpatory evidence to a grand jury. The State further argued that, in any event, the recantation was not exculpatory because it had been retracted. The State informed the court of the substance of the sworn testimony that Daye had given to the representatives from the prosecutor's office and at the parole revocation hearing. The State contended that the recantation was of minimal significance because Daye had been "forced, coerced, threatened and harassed into giving that statement."

The trial court denied the motion to dismiss. The court noted that the role of the grand jury is a limited one, and that a grand jury proceeding is not an adversarial contest. The court concluded that the reliability of Daye's complaint and retracted recantation was an issue properly reserved for the petit jury. The court also questioned the exculpatory value of the recantation evidence, noting that if the grand jury had been informed of the recantation and the circumstances surrounding the recantation it might have charged defendant with additional crimes.

Defendant was tried before a jury on June 27 and 28, and July 1 and 2, 1991. Defendant did not testify, choosing instead to focus on impeaching Daye's credibility. The court admitted into evidence Daye's recantation, the retraction of the recantation, and Daye's explanation of the reasons for the recantation.

The jury found defendant guilty of all charges except unlawful possession of a weapon, which the trial court had dismissed, and aggravated assault. As a repeat Graves Act offender, defendant was sentenced on Count 1 to a fifty-year prison term with sixteen and two-thirds years of parole ineligibility. On Count 3, the court sentenced defendant to a concurrent prison term of fifteen years, with five years of parole ineligibility. The court merged the remaining counts into either Count 1 or Count 3 for sentencing purposes.

On appeal, defendant raised nine points of error. See 281 *N.J.Super.* at 292–93, 657 *A.*2d 462. The Appellate Division agreed with defendant's contention that the trial court should have dismissed the indictment because of the State's failure to present Daye's recantation to the grand jury as exculpatory evidence. *Id.* at 299, 657 *A.*2d 462. Accordingly, the panel reversed defendant's conviction. *Ibid.* The court relied on the standard set forth in *State v. Smith,* 269 *N.J.Super.* 86, 634 *A.*2d 576 (App.Div.1993), *certif. denied,* 137 *N.J.* 164, 644 *A.*2d 612 (1994), under which prosecutors are obligated to inform a grand jury of any evidence that is " 'clearly exculpatory' " or that " 'directly negates [the] guilt' " of the accused. 281 *N.J.Super.* at 295, 657 *A.*2d 462

(quoting *Smith, supra,* 269 *N.J.Super.* at 97, 634 *A.*2d 576). The court concluded that the prosecutor had breached that duty, because Daye's recantation was evidence that, if believed, would establish in itself that defendant had not committed the robbery. *Id.* at 296, 657 *A.*2d 462. The court found fault with the prosecutor for "using the grand jury as its 'playtoy'" and dismissed the indictment without prejudice. *Id.* at 299, 657 *A.*2d 462 (quoting *State v. Engel,* 249 *N.J.Super.* 336, 359, 592 *A.*2d 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991)). In view of its ruling, the court determined that defendant's remaining eight contentions it need not address. *Ibid.*

## II

■ "The grand jury has always occupied a high place as an instrument of justice in our system of criminal law...." *State v. Del Fino,* 100 *N.J.* 154, 165, 495 *A.*2d 60 (1985); *accord State v. Murphy,* 110 *N.J.* 20, 36, 538 *A.*2d 1235 (1988). Indeed, our State Constitution guarantees the grand jury a central role in the enforcement of the criminal law of this State:

> No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases now prosecuted without indictment, or arising in the army or navy or in the militia, when in actual service in time of war or public danger.
>
> [*N.J. Const.* art. I, ¶ 8.]

To fulfill its "constitutional role of standing between citizens and the state," *Del Fino, supra,* 100 *N.J.* at 164, 495 *A.*2d 60, the grand jury is asked to determine whether "a basis exists for subjecting the accused to a trial." *Trap Rock Indus., Inc. v. Kohl,* 59 *N.J.* 471, 487, 284 *A.*2d 161 (1971), *cert. denied,* 405 *U.S.* 1065, 92 *S.Ct.* 1500, 31 *L.Ed.*2d 796 (1972). Specifically, the grand jury must determine whether the State has established a *prima facie* case that a crime has been committed and that the accused has committed it. *See State v. New Jersey Trade Waste Ass'n,* 96 *N.J.* 8, 27, 472 *A.*2d 1050 (1984); *Trap Rock, supra,* 59 *N.J.* at 487–88, 284 *A.*2d 161.

■ The purposes of the grand jury extend beyond bringing the guilty to trial. Equally significant is its responsibility to " 'protect[ ] the innocent from unfounded prosecution.' " *Murphy, supra*, 110 *N.J.* at 29, 538 *A.*2d 1235 (quoting Note, 111 *U. Pa. L.Rev.* 1000, 1003 (1963)). We have repeatedly emphasized that responsibility, noting its roots in English history and its continued constitutional significance. *See State v. LeFurge*, 101 *N.J.* 404, 418, 502 *A.*2d 35 (1986) (noting that one of traditional functions of grand jury is "to safeguard citizens against arbitrary, oppressive, and unwarranted criminal accusations"); *Del Fino, supra*, 100 *N.J.* at 165, 495 *A.*2d 60; *State v. Doliner*, 96 *N.J.* 236, 250, 475 *A.*2d 552 (1984). We have recognized that the grand jury is the " 'primary security to the innocent against hasty, malicious and oppressive persecution,' " *Del Fino, supra*, 100 *N.J.* at 164, 495 *A.*2d 60 (quoting *Wood v. Georgia*, 370 *U.S.* 375, 390, 82 *S.Ct.* 1364, 1373, 8 *L.Ed.*2d 569, 580 (1962)), and that it serves the invaluable function of determining " ' "whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." ' " *Ibid.* (quoting *United States v. Provenzano*, 688 *F.*2d 194, 202 (3d Cir.) (quoting *Wood, supra*, 370 *U.S.* at 390, 82 *S.Ct.* at 1373, 8 *L.Ed.*2d at 580), *cert. denied*, 459 *U.S.* 1071, 103 *S.Ct.* 492, 74 *L.Ed.*2d 634 (1982)). Thus, the grand jury's " 'mission is to clear the innocent, no less than to bring to trial those who may be guilty.' " *State v. Hart*, 139 *N.J.Super.* 565, 568, 354 *A.*2d 679 (App.Div.1976) (quoting *United States v. Dionisio*, 410 *U.S.* 1, 16–17, 93 *S.Ct.* 764, 773, 35 *L.Ed.*2d 67, 81 (1973)).

■ While acknowledging the significance of the grand jury's role in our criminal justice system, this Court has recognized the grand jury's independence and has expressed a reluctance to intervene in the indictment process. *See, e.g., State v. Perry*, 124 *N.J.* 128, 168–69, 590 *A.*2d 624 (1991); *State v. Long*, 119 *N.J.* 439, 478, 575 *A.*2d 435 (1990); *State v. Wein*, 80 *N.J.* 491, 501, 404 *A.*2d 302 (1979); *State v. La Fera*, 35 *N.J.* 75, 81, 171 *A.*2d 311 (1961). Once the grand jury has acted, an "indictment should be disturbed only on the 'clearest and plainest ground,' " *Perry, supra*, 124 *N.J.*

at 168, 590 *A*.2d 624 (quoting *New Jersey Trade Waste Ass'n.,* *supra,* 96 *N.J.* at 18–19, 472 *A.*2d 1050), and only when the indictment is manifestly deficient or palpably defective. *E.g., Wein, supra,* 80 *N.J.* at 501, 404 *A.*2d 302. Moreover, the decision whether to dismiss an indictment lies within the discretion of the trial court, *State v. McCrary,* 97 *N.J.* 132, 144, 478 *A.*2d 339 (1984), and that exercise of discretionary authority ordinarily will not be disturbed on appeal unless it has been clearly abused. *E.g., State v. Weleck,* 10 *N.J.* 355, 364, 91 *A.*2d 751 (1952).

We have demonstrated a greater willingness to review grand jury proceedings where the alleged deficiency in the proceedings affects the grand jurors' ability to make an informed decision whether to indict. See *Murphy, supra,* 110 *N.J.* at 35, 538 *A.*2d 1235 (recognizing general reluctance of courts to dismiss indictments, but noting that indictment may be dismissed if alleged misconduct infringes on grand jury's decision-making function); *Del Fino, supra,* 100 *N.J.* at 164–65, 495 *A.*2d 60 (criticizing grand jurors for voting to indict without having been present at all grand jury sessions, and stating that grand jurors who vote to indict must be informed of evidence presented at each session); *see also Hart, supra,* 139 *N.J.Super.* at 568–69, 354 *A.*2d 679 (dismissing indictment because prosecutor improperly encroached on independence of grand jury by telling some jurors that their initial vote not to indict was wrong). Defendant thus argues that denying the grand jury access to significant, exculpatory evidence interferes with the grand jury's decision-making function. In such cases, defendant contends, dismissal of the indictment is warranted.

The United States Supreme Court considered and rejected that contention in *United States v. Williams,* 504 *U.S.* 36, 112 *S.Ct.* 1735, 118 *L.Ed.*2d 352 (1992). Resolving a split in the federal circuits, the *Williams* Court held that under no circumstances could a federal court dismiss an indictment on the ground that the prosecutor had failed to present exculpatory evidence to the grand jury. *Id.* at 55, 112 *S.Ct.* at 1746, 118 *L.Ed.*2d at 370. The Court stated that the grand jury is an accusative rather than an adjudi-

cative body, and that requiring the grand jury to weigh inculpatory and exculpatory evidence would alter the grand jury's historical role. *Id.* at 51, 112 *S.Ct.* at 1744, 118 *L.Ed.*2d at 368. The Court explained:

> It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge. See *United States v. Calandra,* 414 *U.S.,* at 343, 94 *S.Ct.* 613, 38 *L.Ed.*2d 561. That has always been so; and to make the assessment it has always been thought sufficient to hear only the prosecutor's side.
>
> *Ibid.*

An even more fundamental basis for the Court's holding was its conclusion that the federal courts do not possess the authority to prescribe standards of prosecutorial conduct before the grand jury. *See id.* at 46–47, 112 *S.Ct.* at 1742, 118 *L.Ed.*2d at 365. The Court emphasized that "the grand jury is an institution separate from the courts, over whose functioning the courts do not preside." *Id.* at 47, 112 *S.Ct.* at 1742, 118 *L.Ed.*2d at 365.

The majority opinion in *Williams* elicited a strong dissent from Justice Stevens, joined by three other members of the Court. See *id.* at 55, 112 *S.Ct.* at 1746, 118 *L.Ed.*2d at 370 (Stevens, J., dissenting). The dissent rejected the majority's conclusion that the Court lacked the power to prescribe rules of prosecutorial conduct for grand jury proceedings. Although acknowledging that the grand jury is an "independent, inquisitorial institution," *id.* at 68, 112 *S.Ct.* at 1753, 118 *L.Ed.*2d at 378, Justice Stevens found that it nonetheless is an appendage of the courts, *id.* at 66, 112 *S.Ct.* at 1752, 118 *L.Ed.*2d at 377, and that the Court therefore has the authority to supervise the conduct of the prosecutor in grand jury proceedings. *Id.* at 65, 112 *S.Ct.* at 1751, 118 *L.Ed.*2d at 379.

The dissent found the need for such supervision particularly acute in cases involving failure of a prosecutor to provide a grand jury with evidence that could exculpate the accused:

> "[W]hile in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the

prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened."

[*Id.* at 63, 112 *S.Ct.* at 1750, 118 *L.Ed.*2d at 375 (quoting *United States v. Serubo,* 604 *F.*2d 807, 817 (3d Cir.1979)).]

The dissent acknowledged that because the role of the grand jury is a limited one, the grand jury need not be exposed to all evidence that could be used at trial to create a reasonable doubt regarding the defendant's guilt. See *id.* at 69, 112 *S.Ct.* at 1753–54, 118 *L.Ed.*2d at 379. However, "that does not mean that the prosecutor may mislead the grand jury into believing that there is probable cause to indict by withholding clear evidence to the contrary." *Id.* at 69, 112 *S.Ct.* at 1754, 118 *L.Ed.*2d at 379. The dissent concluded that a prosecutor should be required to present to a grand jury " 'substantial evidence which directly negates the guilt' " of an accused. *Id.* at 69–70, 112 *S.Ct.* at 1754, 118 *L.Ed.*2d at 379 (quoting United States Dep't of Justice, *United States Attorneys' Manual,* Title 9, ch. 11, ¶ 9–11.233, 88 (1988)).

Although "we have interpreted our constitutional guarantee of indictment by a grand jury in light of federal precedent," *Murphy, supra,* 110 *N.J.* at 29, 538 *A.*2d 1235 (citation omitted), we do not find the Supreme Court's decision in *Williams* to be dispositive of the case at hand. Despite the *Williams* Court's conclusion that it did not have the authority to adopt the rule sought by the defendant in that case, our precedents make clear that this Court may invoke its supervisory power to remedy perceived injustices in grand jury proceedings. *See, e.g., Murphy, supra,* 110 *N.J.* at 33, 538 *A.*2d 1235; *Del Fino, supra,* 100 *N.J.* at 157, 165, 495 *A.*2d 60; *see also R.* 3:6–1 to –11 (setting forth procedures to be followed in grand jury proceedings). Moreover, we have often extended greater protections to defendants' rights than have the federal courts. *E.g., State v. Reed,* 133 *N.J.* 237, 251–52, 627 *A.*2d 630 (1993); *State v. Sanchez,* 129 *N.J.* 261, 274, 609 *A.*2d 400 (1992); *State v. Mollica,* 114 *N.J.* 329, 352, 554 *A.*2d 1315 (1989). We note, in addition, the criticism directed at *Williams* for its failure to protect the grand jury's historical function of "filter[ing] out unfounded criminal allegations and shield[ing] an individual

from a malicious prosecutor." Patrick F. Mastrian, III, Note, "Indianhead Poker in the Grand Jury Room: Prosecutorial Suppression of Exculpatory Evidence," 28 *Val. U.L.Rev.* 1377, 1379 (1994); see, *e.g.,* Fred A. Bernstein, Note, "Behind the Gray Door: *Williams,* Secrecy, and the Federal Grand Jury," 69 *N.Y.U. L.Rev.* 563, 587–91 (1994); Elizabeth G. McKendree, Note, "*United States v. Williams:* Antonin's *Costello*—How the Grand Jury Lost the Aid of the Courts as a Check on Prosecutorial Misconduct," 37 *How. L.J.* 49, 81 (1993).

Of the nineteen state courts that have confronted the issue, three have determined that a prosecutor has no duty to present exculpatory evidence to a grand jury. See *People v. Beu,* 268 *Ill.App.*3d 93; 205 *Ill.Dec.* 811, 644 *N.E.*2d 27, 30 (1994); *State v. Easter,* 661 *S.W.*2d 644, 645 (Mo.Ct.App.1983); *State v. Acquisto,* 463 *A.*2d 122, 127 (R.I.1983).

In sharp contrast are those states with a broad rule requiring a prosecutor to inform the grand jury of exculpatory evidence. See *Mont.Code Ann.* § 46–11–314 commission cmts. and compiler's cmts. (requiring production of "exculpatory evidence" that will "explain away the charge"); *Johnson v. Superior Court,* 15 *Cal.*3d 248, 124 *Cal.Rptr.* 32, 34, 36, 539 *P.*2d 792, 794, 796 (1975) (requiring production of any evidence that reasonably tends to negate guilt); *Lay v. State,* 110 *Nev.* 1189, 886 *P.*2d 448, 453 (1994) (requiring production of exculpatory evidence that will "explain away the charge"); *State v. Sandoval,* 842 *S.W.*2d 782, 789 (Tex. App.-Corpus Christi 1992) (noting that justice would best be served by production of any information that could affect grand jury's decision whether to indict) (dicta).

Other states require exculpatory evidence to be presented to a grand jury only if the exculpatory value of the evidence is substantial. See *N.M. Stat. Ann.* § 31–6–11(B) (requiring presentation of evidence that directly negates guilt of accused); *Lipscomb v. State,* 700 *P.*2d 1298, 1302 (Alaska.Ct.App.1985) (evidence that is substantially favorable to accused); *State v. Coconino County Superior Court,* 139 *Ariz.* 422, 678 *P.*2d 1386, 1389 (1984) (evi-

dence that is clearly exculpatory); *State v. Couture,* 194 *Conn.* 530, 482 *A.*2d 300, 315 (1984) (substantial evidence that would negate accused's guilt), *cert. denied,* 469 *U.S.* 1192, 105 *S.Ct.* 967, 83 *L. Ed.*2d ·971 (1985); *Miles v. United States,* 483 *A.*2d 649, 655 (D.C.1984) (substantial evidence negating guilt that might reasonably be expected to lead grand jury not to indict); *State v. Hall,* 66 *Haw.* 300, 660 *P.*2d 33, 34 (1983) (evidence that is clearly exculpatory); *Commonwealth v. LaVelle,* 414 *Mass.* 146, 605 *N.E.*2d 852, 855 (1993) (evidence that would greatly undermine credibility of evidence likely to affect grand jury's decision to indict); *State v. Moore,* 438 *N.W.*2d 101, 105 (Minn.1989) (evidence that would materially affect grand jury proceeding); *State v. Skjonsby,* 319 *N.W.*2d 764, 783 (N.D.1982) (evidence that would preclude issuing indictment); *People v. Ramjit,* 203 *A.D.*2d 488, 612 *N.Y.S.*2d 600, 602 (evidence that implicates complete legal defense or could eliminate needless or unfounded prosecution), *appeal denied,* 84 *N.Y.*2d 831, 617 *N.Y.S.*2d 151, 641 *N.E.*2d 172 (1994); *Mayes v. City of Columbus,* No. 94APE09–1316, 1995 WL 499028, at *6 (Ohio.Ct.App. Aug.17, 1995) (substantial evidence that negates guilt); *State v. Harwood,* 45 *Or.App.* 931, 609 *P.*2d 1312, 1316–17 (1980) (evidence that "objectively refutes ... the state's evidence").

In *State v. Smith,* 269 *N.J.Super.* 86, 634 *A.*2d 576 (1993), *certif. denied,* 137 *N.J.* 164, 644 *A.*2d 612 (1994), the Appellate Division confronted the issue and imposed a very narrow duty on prosecutors to present exculpatory evidence to a grand jury. *Smith* involved a defendant who was convicted of first-degree robbery and related offenses based on the testimony of the victim and another eyewitness. *Id.* at 88–90, 634 *A.*2d 576. Before the case was presented to the grand jury, defense counsel provided the prosecutor with three "exculpatory" witness statements that "put [the defendant] at a different [yet nearby] location and [in an] intoxicated [condition] some one and one-half hours before the robbery." *Id.* at 97, 634 *A.*2d 576. The defendant claimed before the Appellate Division that the prosecutor's failure to present

those statements to the grand jury required the dismissal of the indictment against the defendant. *Id.* at 91, 634 *A.*2d 576.

The court rejected both the *Williams* rule and the "somewhat amorphous" California rule providing that prosecutors should disclose to the grand jury any evidence that reasonably tends to negate the guilt of an accused. *Id.* at 97, 634 *A.*2d 576. The Appellate Division held that a prosecutor must provide the grand jury with evidence that "clearly exculpates a defendant, that is, evidence that directly negates a defendant's guilt." *Id.* at 93, 634 *A.*2d 576. Indicating that that duty applies only in the exceptional case and only after a consideration of the reliability of the exculpatory evidence in question, *id.* at 96–97, 634 *A.*2d 576, the court concluded that the proffered witness statements did not negate the defendant's guilt, and thus did not need to be presented to the grand jury. *Id.* at 97, 634 *A.*2d 576; *see also State v. Gaughran,* 260 *N.J.Super.* 283, 615 *A.*2d 1293 (Law Div.1992) (dismissing sexual assault indictment because of prosecutor's failure to present grand jury with medical evidence contradicting alleged victim's claim).

As noted, in the opinion below the Appellate Division interpreted the *Smith* standard as requiring prosecutors to inform the grand jury of any evidence that, if believed, would establish that the accused did not commit the crime in question. 281 *N.J.Super.* at 296, 657 *A.*2d 462. The court found Daye's recantation to be such evidence, and, accordingly, the court dismissed the indictment against defendant. *Ibid.*

The Law Division followed the *Hogan* approach in *State v. Epps,* 284 *N.J.Super.* 373, 665 *A.*2d 412 (1995), which was decided shortly after the publication of the *Hogan* opinion. The defendant in *Epps* had been indicted for various offenses relating to the sexual assault of a child. *Id.* at 376, 665 *A.*2d 412. The charges were based on claims of abuse made by the alleged victim. *Id.* at 375–76, 665 *A.*2d 412. The defendant argued that the indictment should be dismissed because the prosecutor had not informed the grand jury that the victim previously had stated that he had never

been touched by the defendant. *Id.* at 377, 665 *A.*2d 412. Applying the interpretation of the *Smith* standard that the Appellate Division set forth in *Hogan,* the *Epps* court concluded that "[i]f the grand jury had believed the victim's [earlier] statements . . ., this evidence would have directly negated defendant's guilt." *Id.* at 379, 665 *A.*2d 412. Thus, the court dismissed the indictment, holding that the prosecutor had a duty to provide the grand jury with the victim's prior exculpatory statements. *Id.* at 380, 665 *A.*2d 412.

Despite the Appellate Division's discussion in *Smith* concerning the need to evaluate the reliability of the alleged exculpatory evidence, see 269 *N.J.Super.* at 97, 634 *A.*2d 576, neither the *Epps* nor *Hogan* courts engaged in such an analysis. In our view, the opinions in *Hogan* and *Epps* reflect an unwarranted expansion of the prosecutorial duty set forth in *Smith.*

### III

■ The United States Supreme Court accurately characterized the grand jury as an accusatory and not an adjudicative body. See *Williams, supra,* 504 *U.S.* at 51, 112 *S.Ct.* at 1744, 118 *L.Ed.*2d at 368. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated." *United States v. Calandra,* 414 *U.S.* 338, 343, 94 *S.Ct.* 613, 618, 38 *L.Ed.*2d 561, 569 (1974); *accord Hart, supra,* 139 *N.J.Super.* at 567, 354 *A.*2d 679. We thus decline to adopt any rule that would compel prosecutors generally to provide the grand jury with evidence on behalf of the accused. Such a rule would unduly alter the traditional function of the grand jury by changing the proceedings from an *ex parte* inquest into a mini-trial.

■ The grand jury's role is not to weigh evidence presented by each party, but rather to investigate potential defendants and decide whether a criminal proceeding should be commenced. *See Calandra, supra,* 414 *U.S.* at 343–44, 94 *S.Ct.* at 618, 38 *L.Ed.*2d at 569. Credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury. *See, e.g.,*

*Ramjit, supra,* 612 *N.Y.S.*2d at 602. In seeking an indictment, the prosecutor's sole evidential obligation is to present a *prima facie* case that the accused has committed a crime.

Nevertheless, in establishing its *prima facie* case against the accused, the State may not deceive the grand jury or present its evidence in a way that is tantamount to telling the grand jury a "half-truth." Although the grand jury is not the final adjudicator of guilt and innocence, the presence of the right to indictment in the State Constitution indicates that the grand jury was intended to be more than a rubber stamp of the prosecutor's office. *See Engel, supra,* 249 *N.J.Super.* at 359, 592 *A.*2d 572. Our State Constitution envisions a grand jury that protects persons who are victims of personal animus, partisanship, or inappropriate zeal on the part of a prosecutor. *See Del Fino, supra,* 100 *N.J.* at 164–65, 495 *A.*2d 60; *see also United States v. Serubo,* 604 *F.*2d 807, 817 (3d Cir.1979) (discussing devastating personal and professional impact of being indicted, and noting that later acquittal often fails to alleviate such impact).

In order to perform that vital protective function, the grand jury cannot be denied access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a *prima facie* case against the accused. *See* Peter Arenella, "Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication," 78 *Mich.L.Rev.* 468, 549 (1980). If evidence of that character is withheld from the grand jury, the prosecutor, in essence, presents a distorted version of the facts, *id.* at 551, and interferes with the grand jury's decision-making function. *See Murphy, supra,* 110 *N.J.* at 35, 538 *A.*2d 1235; *cf. State v. Marshall,* 123 *N.J.* 1, 152, 586 *A.*2d 85 (1991) ("The primary duty of a prosecutor is not to obtain convictions but to see that justice is done.").

Our perception is that the routine presentation of evidence by prosecutors to grand juries only rarely will involve significant questions about exculpatory evidence. More often than

not the evidence accumulated by the prosecutor abundantly demonstrates probable cause for return of an indictment. Typically, the prosecutor's file will not include clearly exculpatory evidence that directly negates a prospective defendant's guilt. Hence, the standard we adopt is intended to be applied only in the exceptional case in which a prosecutor's file includes not only evidence of guilt but also evidence negating guilt that is genuinely exculpatory.

For those unique cases, we generally endorse the analysis set forth by the Appellate Division in *Smith*, and conclude that the competing concerns we have discussed are best reconciled by imposing a limited duty on prosecutors, a duty that is triggered only in the rare case in which the prosecutor is informed of evidence that both directly negates the guilt of the accused *and* is clearly exculpatory. We modify the *Smith* standard to the extent that the prosecutor's duty arises only if the evidence satisfies two requirements: it must directly negate guilt and must also be clearly exculpatory.

Confining the prosecutor's duty to the presentation of evidence that directly negates the guilt of the accused recognizes that the sole issue before the grand jury is whether the State has made out a *prima facie* case of the accused's guilt. Thus, unless the exculpatory evidence at issue squarely refutes an *element* of the crime in question, that evidence is not within the prosecutorial duty we have set forth. For example, the State is not required to inform the grand jury of evidence that indicates that the accused did not have a motive for committing the crime for which the State seeks an indictment. Similarly, the State need not impeach the credibility of the State's witnesses appearing before the grand jury by informing the grand jury of the witnesses' criminal records.

The second requirement, that the evidence in question be "clearly exculpatory," requires an evaluation of the quality and reliability of the evidence. The exculpatory value of the evidence should be analyzed in the context of the nature and source of the evidence, and the strength of the State's case. For example, if the

exculpatory evidence in question is eyewitness testimony, potential bias on the part of the eyewitness may affect the prosecutor's obligation to present the witness's testimony to the grand jury. Similarly, the exculpatory testimony of one eyewitness is not "clearly exculpatory" if contradicted by the incriminating testimony of a number of other witnesses. Moreover, an accused's self-serving statement denying involvement in a crime, although such a statement directly negates guilt, ordinarily would not be sufficiently credible to be "clearly exculpatory," and need not be revealed to the grand jury. *See* 2 Wayne R. LeFave & Jerold H. Israel, *Criminal Procedure* § 15.4(d), at 319–20 (1984).

On the other hand, the credible testimony of a reliable, unbiased alibi witness that demonstrates that the accused could not have committed the crime in question would be clearly exculpatory. Similarly, physical evidence of unquestioned reliability demonstrating that the defendant did not commit the alleged crime would be clearly exculpatory, and the grand jury should be informed of such evidence. *See Gaughran, supra,* 260 *N.J.Super.* 283, 615 *A.*2d 1293. In such instances, a failure to present the exculpatory evidence to the grand jury may raise questions about the prosecuting attorney's good faith and could deprive the grand jury of the opportunity to screen out unwarranted prosecutions.

We note, however, that the prosecutor need not construct a case for the accused or search for evidence that would exculpate the accused. Only when the prosecuting attorney has actual knowledge of clearly exculpatory evidence that directly negates guilt must such evidence be presented to the grand jury. Moreover, courts should dismiss indictments on this ground only after giving due regard to the prosecutor's own evaluation of whether the evidence in question is "clearly exculpatory." Ascertaining the exculpatory value of evidence at such an early stage of the proceedings can be difficult, *see, e.g.,* 2 LeFave & Israel, *supra,* § 15.4(d), at 318, and courts should act with substantial caution before concluding that a prosecutor's decision in that

regard was erroneous. We emphasize that only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury constitute grounds for challenging an indictment.

 Applying the standard we have adopted to the case at hand, we entertain no doubt that the trial court properly denied defendant's motion to dismiss the indictment. The State was not obligated to inform the grand jury of Daye's recantation because evidence regarding the recantation would not have been "clearly exculpatory."

 "[R]ecantation testimony is generally considered exceedingly unreliable." 58 *Am.Jur.*2d "New Trial" § 440 (1989); *accord State v. Carter,* 69 *N.J.* 420, 427, 354 *A.*2d 627 (1976); *State v. Baldwin,* 47 *N.J.* 379, 400, 221 *A.*2d 199, *cert. denied,* 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966). Partly because recantations are often induced by duress or coercion, 58 *Am.Jur.*2d, *supra,* § 440, the sincerity of a recantation is to be viewed with "extreme suspicion." *United States v. Santiago,* 837 *F.*2d 1545, 1550 (11th Cir.1988). Moreover, prior to the second grand jury proceeding, Daye retracted her recantation and explained under oath the intimidation and threats that earlier had frightened her into recanting her complaint. *See United States v. Gaffney,* 689 *F.Supp.* 1580, 1583 (M.D.Fla.1988) (noting that retraction of recantation renders prior recantation a nullity and restores effect of original allegations); *Engel, supra,* 249 *N.J.Super.* at 384–87, 592 *A.*2d 572.

Daye's recantation may be pertinent to her credibility as a witness to the events in question. However, in view of the generally unreliable nature of recantation testimony, the circumstances surrounding Daye's recantation, and her retraction of the recantation, we are convinced that this recantation evidence could not conceivably be considered sufficiently reliable to be "clearly exculpatory." To the contrary, Daye's recantation was highly unreliable evidence. *See People v. Dillard,* 214 *A.D.*2d 1028, 627 *N.Y.S.*2d 184, 184 (1995) (holding that prosecutor's failure to

inform grand jury of witness's recantation of prior allegations against defendant did not require dismissal of indictment, because "[s]uch evidence merely relates to credibility"). The recantation did not affect the State's *prima facie* case of guilt against defendant, and thus the prosecutor did not commit misconduct in not revealing the recantation to the grand jury. Determining the impact of Daye's recantation on the State's case against defendant was a responsibility properly reserved for the petit jurors, who heard all the evidence and found defendant guilty beyond a reasonable doubt of five of the charged offenses.

## IV

The judgment of the Appellate Division is reversed. The case is remanded to the Appellate Division for consideration and disposition of defendant's remaining contentions.

*For reversal and for remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.