**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0472-18T2

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

EVAN PESCATORE, FRANK
PESCATORE, and JANICE
PESCATORE,

    Defendants-Respondents.

_____

Argued June 4, 2019 – Decided June 26, 2019

Before Judges Yannotti, Gilson and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-04-0069.

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the brief).

Edward C. Bertucio, Jr. and Jessica A. Wilson argued the cause for respondents (Kalavruzos Mumola Hartman & Lento LLC, attorneys; Edward C. Bertucio,

Jr. and William Les Hartman, of counsel and on the brief; Jessica Ann Wilson, on the brief).

PER CURIAM

The State appeals from the Law Division's dismissal of an indictment charging defendants Evan Pescatore, and his father, Frank Pescatore, with: (1) first-degree conspiracy to commit financial facilitation of a criminal activity, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-25; (2) second-degree conspiracy to commit theft by deception, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:20-4; (3) second-degree conspiracy to commit insurance fraud, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-4.6; (4) second-degree financial facilitation of a criminal activity, contrary to N.J.S.A. 2C:21-25 and N.J.S.A. 2C:2-6; (5) second-degree insurance fraud, contrary to N.J.S.A. 2C:21-4.6 and N.J.S.A. 2C:2-6; and (6) second-degree theft by deception, contrary to N.J.S.A. 2C:20-4(a) and N.J.S.A. 2C:2-6. In addition to the aforementioned charges, Evan was also charged with first-degree financial facilitation of a criminal activity, contrary to N.J.S.A. 2C:21-25. Finally, Janice Pescatore, Evan's mother, was charged with first-degree conspiracy, contrary to N.J.S.A. 2C:5-2; and second-degree financial facilitation of a criminal activity, contrary to N.J.S.A. 2C:21-25 and N.J.S.A. 2C:2-6. We reverse and remand for entry of an order reinstating the indictment.

2

I.

We glean the following facts from the testimony at the April 12, 2017 grand jury proceeding in this matter. Evan is a licensed insurance intermediary in New Jersey. Between 2011 and 2015, he worked as a life insurance agent for numerous life insurance companies, including Allianz Life Insurance Company (Allianz). During that time period, Evan placed eighteen life insurance policies with eight insurance companies involving thirteen insureds.

Detective Natalie Brotherston, a detective with the Division of Criminal Justice, Office of the Insurance Fraud Prosecutor, was assigned to investigate Evan, Frank, and Janice in April 2012, after receiving a referral from Allianz reporting that it believed a policy brokered by Evan was "rebated." As Brotherston explained, rebating occurs "when something of value is given in order to sell a policy that would not have been provided in the policy itself[,] . . . [such as] cash, a gift, service, [or] employment." Allianz alleged that an insured misrepresented that he was not offered "inducement in the form of free insurance," by falsely informing Allianz on the application, as well as in a telephonic interview, that he would be paying the premium himself when, in fact, a third-party financing company had been arranged to pay the premium.

3

Brotherston also learned during her investigation that seven other insurance companies that issued insurance policies originating with Evan also claimed he offered "rebated" policies. After speaking with representatives from the eight companies, Brotherston learned that Evan placed eighteen insurance policies that contained material misrepresentations regarding how the premiums were paid, similar to the false information contained on the Allianz application. The insurer representatives advised Brotherston that had they known that the eighteen insureds did not intend to pay their own insurance premiums, the insurers "would have declined to make effective any policies for any of the [eighteen] applications for life insurance."

During her investigation, Brotherston met with twelve of the thirteen insureds directly and spoke with the husband of the thirteenth, regarding the circumstances surrounding placement of the insurance. The majority of these individuals reported that they were acquainted socially with Frank, who introduced them to Evan "as his son and a life insurance agent."

Brotherston testified that "Frank and/or Evan" discussed the opportunity to obtain "free" insurance with the proposed insureds, and met with the individuals to fill out the life insurance applications. Most of the insureds reported to Brotherston that they "never read the applications and merely signed

the application where and when Frank and/or Evan . . . instructed him or her to do so."

All of the insureds reported that they did not intend to pay the premiums themselves, and a majority of them were told by "Frank and/or Evan" that a group of investors would pay their premiums. Further, "a couple" of the insureds admitted to Brotherston that "Evan and/or Frank . . . told them to lie to the insurance company about who was paying their premiums when . . . contacted . . . for a telephone interview . . . ." The insureds also told Brotherston they would not have applied for life insurance with "Evan or Frank if they had to pay the premiums themselves."

Brotherston testified that twelve of the insureds referred to Evan and Frank collectively. Accordingly, Brotherston stated that she repeatedly referenced "Frank and/or Evan," during the grand jury proceedings as they were "so entwined in th[e] enterprise."

The insureds also stated that because they were closer in age to Frank and knew him first, most contacted him with questions regarding the policies. Further, one of the insureds reported to Brotherston that he believed Janice was present when he first discussed purchasing a life insurance policy with Evan or Frank.

5

The documentary evidence presented to the grand jurors included the insurance applications that Evan signed which "certif[ied] that the information provided by the applicants [was] true and . . . accurately recorded." Frank, who was not a licensed insurance producer, did not sign the applications, but as Brotherston testified, he helped prepare all eighteen applications.

Brotherston stated that she reviewed each of the eighteen insurance applications, and in each application, the prospective insured stated that he or she did not intend to finance any of the premium payments through financing or loan agreement. Further, in thirteen of the applications, the insureds affirmatively stated that no "compensation or other inducement[,] including offers or discussions of free insurance had been offered directly or indirectly to the applicant to apply for the policy."

Brotherston informed the grand jurors that despite the aforementioned express representations, she discovered that "Evan and/or Frank" arranged for the insureds' premiums to be paid by four different third-party lending sources. She testified that through a review of the lending sources' and the insureds' bank records, and the insureds' insurance files, the Office of the Insurance Fraud Prosecutor (OIFP) was able to determine that "the payment for th[e] premium[s] directly originated from one of the[] four lending sources." However, the

insureds made the premium payments from their own accounts, "ma[king] it appear that the funds were their own."

Some of the insureds who were interviewed by Brotherston reported that they provided their banking information to "Evan or Frank," and then waited for the funds to be transferred to their accounts from the lending source. Thereafter, the insureds passed the funds transferred by the third party lending source to the insurance company, thereby acting as a "conduit by which money for the premium payment goes to the insurance company."

Once the insurance companies received an application, other necessary documentation, and the premium payment, they paid Evan a commission as the originating insurance agent. Brotherston testified that in general, the greater the premium paid to the insurance company, the greater the commission received by an insurance agent. The eight insurance companies at issue reported agents, like Evan, are paid an initial commission payment of 70% to 120% of the policy's first year premium.

Upon Evan's receipt of the commissions, a portion was "forwarded or passed . . . along to the lending source[s]," to pay back the premiums. Brotherston testified that Evan had two bank accounts, one of which was jointly owned by Janice. Additionally, Janice had three other bank accounts, one of

7

which was jointly owned by Frank. In its review of these accounts, the State traced the flow of commissions from the insurance companies into one of these bank accounts, and then back to the lending sources that paid the original premium payments. According to Brotherston, the money "was going around in a circle."

An analyst from the OIFP created a diagram shown to the grand jurors which detailed how the alleged conspiracy was financed, and profits were earned. Brotherston explained that the "left side of the diagram represent[ed] the circular flow of money from the lending source to the insured to the insurance company to Evan . . . and then back to the lending source." The right side depicted how profits were made through "hierarchy" commissions. Brotherston testified that an insurance agent can have "one or many supervising agents assigned to each policy." She explained that commissions were also paid out to Evan's hierarchy, or his supervising agents, and that Evan received a percentage of those hierarchy commissions.

Brotherston quantified that Evan earned over $500,000 in commissions, and would forward a portion of those commissions to Janice. In support of this claim, the grand jurors were presented with checks made out to Janice from Evan after Evan received a commission. The checks stated "commission," and some

identified the name of a particular insured on the memo line. By the time of the grand jury proceeding, only six of the eighteen insurance policies were still in effect, two of which were in a grace period due to non-payment of premiums owed on the policies.

Defendants moved to dismiss the indictment claiming primarily that the State: (1) failed to inform the grand jurors that premium financing is legal in New Jersey; and (2) improperly referred to defendants collectively, rather than individually. After hearing oral arguments, the court granted the motion in an August 24, 2018 order.

In an accompanying written opinion issued the same day, the court concluded that the grand jury "was not presented with a full and accurate picture of the case against" the defendants. Specifically, the court noted that the "crux" of the State's case was based on the notion that "a third party lender is unable to finance the premiums for another's insurance." The court determined that "the State implied to the grand jury that the process of third party financing was illegal," when, in fact, it is not a crime in the State of New Jersey.

Additionally, the court found troublesome the State's "collective presentation of the defendants as a group rather than individuals." The court noted that "the State referred collectively to 'Frank and/or Evan Pescatore,' 'Evan

and/or Frank Pescatore,' 'Frank and Evan Pescatore,' or 'Frank or Evan Pescatore' as the individuals who committed the crimes." The court also observed that on forty-one occasions, the State described all three defendants as "the Pescatores."

Particularly concerning to the court was the State's presentation involving Janice, as the court concluded that the State "failed to present a prima facie case that Janice . . . had any knowledge of her husband['s] and son's transactions." The court stated that "[i]n order to present a prima facie case, the State needs to set forth which individual committed which parts of the crime."

After the court dismissed the indictment, the State filed this appeal in which it argues:

> POINT I
>
> THIS COURT SHOULD REVERSE THE MOTION COURT'S RULING AND REINSTATE INDICTMENT NO. 17-04-00069-S BECAUSE THE STATE PRESENTED A PRIMA FACIE CASE IN SUPPORT OF ALL EIGHT COUNTS.
>
> POINT II
>
> THE STATE HAD NO OBLIGATION TO INSTRUCT THE GRAND JURY THAT THIRD-PARTY PREMIUM FINANCING IS NOT A CRIME BECAUSE SUCH AN INSTRUCTION WOULD NOT HAVE DIRECTLY NEGATED DEFENDANTS' GUILT OF THE CRIMES ALLEGED

POINT III

THE STATE ESTABLISHED A PRIMA FACIE CASE
WITH RESPECT TO ALL THREE DEFENDANTS
FOR THE RELEVANT CHARGES

II.

"[T]he decision whether to dismiss an indictment lies within the discretion of the trial court, and that exercise of discretionary authority ordinarily will not be disturbed on appeal unless it has been clearly abused." State v. Hogan, 144 N.J. 216, 229 (1996) (citation omitted). "However, if a trial court's discretionary decision is based upon a misconception of the law, a reviewing court owes that decision no particular deference." State v. Zembreski, 445 N.J. Super. 412, 424 (App. Div.2016) (quoting State v. Lyons, 417 N.J. Super. 251, 258 (App. Div. 2010)).

"The grand jury's role is not to weigh evidence presented by each party, but rather to investigate potential defendants and decide whether a criminal proceeding should be commenced." Hogan, 144 N.J. at 235. Accordingly, a prosecutor seeking an indictment is required to "present a prima facie case that the accused has committed a crime." Id. at 236. An indictment should not be dismissed "as long as 'some evidence' on each of the elements of the offenses is presented and there is nothing that detracted from the fairness of the grand jury

proceeding." State v. Scherzer, 301 N.J. Super. 363, 428 (App. Div. 1997). Additionally, grand jury proceedings carry a "presumption of validity," as prosecutors enjoy "broad discretion in presenting a matter to the grand jury." State v. Smith, 269 N.J. Super. 86, 92 (App. Div. 1993).

Prosecutors have a limited duty to present exculpatory evidence to a grand jury. Such proofs must be presented if the evidence: (1) "directly negate[s] [the] guilt" of the accused; and (2) is "clearly exculpatory." Hogan, 144 N.J. at 237. In this regard, "unless the exculpatory evidence at issue squarely refutes an element of the crime in question, that evidence is not within the prosecutorial duty." Ibid.

Further, "in determining the sufficiency of the evidence to sustain the indictment, every reasonable inference is to be given to the State." State v. N.J. Trade Waste Assoc., 96 N.J. 8, 27 (1984). Therefore, "a defendant who challenges an indictment must 'demonstrate that evidence is clearly lacking to support the charge.'" State v. Graham, 281 N.J. Super. 413, 417 (App. Div. 1995) (quoting McCrary, 97 N.J. at 142). Applying these guiding principles, we conclude that the motion judge mistakenly exercised his discretion by dismissing the indictment.

A-0472-18T2

III.

We agree with the State that it was under no obligation to present the grand jury with information that third-party financing is legal in New Jersey, as such evidence is neither clearly exculpatory, nor does it directly negate any of the defendants' guilt.  See Hogan, 144 N.J. at 237.  Although defendants correctly note that under the Insurance Premium Finance Company Act, N.J.S.A. 17:16D-1- to -16,[1] financing of insurance premiums is legal in New Jersey, contrary to the court's conclusion, the "crux" of the State's case was not predicated on the fact that a lender is not permitted to finance an insured's premium.

Rather, the State's theory of the Pescatores' crimes was fairly simple. Essentially, the State presented a prima facie case, giving it all reasonable inferences, that Evan, with Frank's and Janice's knowledge and participation,

---

[1] The Act provides in pertinent part that:

> [n]o person shall engage in the business of financing insurance premiums in this State without first having obtained a license as a premium finance company from the Commissioner of Banking and Insurance, except that any State or national bank authorized to do business in this State shall be authorized to transact business as a premium finance company, subject to all the provisions of this act, except that it shall not be required to obtain a license or pay a license fee . . . .
> [N.J.S.A. 17:16D-4]

placed the eighteen policies for one simple reason – to ensure the receipt of commissions that would not otherwise have been paid if the insurers had not been misled by false, material misstatements of fact concerning the policies. To accomplish that goal, the State presented evidence that Evan and/or Frank told certain insureds that they would be receiving "free insurance," which Evan then falsely stated about when asked by the insurance companies in thirteen of the applications. In addition, the evidence before the grand jury showed that Evan and/or Frank arranged for third-party financing for each insured, lied about that fact, and further hid that the policies were being financed by taking secretive steps to funnel the third-party payments into the insureds' bank accounts before having the insureds pay the premium.

Thus, defendants' arguments that the State should have informed the grand jurors that New Jersey law permits a third-party premium finance company to pay a premium on an insured's behalf, and that certain of the insurance companies allegedly defrauded actually provide for such financing, misses the point for at least two reasons. First, those claims have no effect on the State's proofs that Frank and Evan promised "free" life insurance to thirteen insureds, without properly disclosing to the insurance companies the third-party financing arrangement, and complying with any applicable rules established by the

14

insurance companies regarding such financing. Second, that New Jersey law permits third-party premium financing has no impact on Brotherston's testimony that, had the eight insurance companies known that the thirteen insureds did not intend to pay their own premiums, they would not have issued the policies.

IV.

We also agree with the State that it established a prima facie case with respect to each defendant on all relevant charges, and that the court erred in dismissing the indictment based on the State's reference to the defendants collectively. We first conclude that the references to "Frank and/or Evan" during the grand jury proceeding were appropriate because they were "so entwined" in the scheme that the insureds frequently referred to them together during their interviews with Brotherston.

Additionally, with respect to the State's collective references to "the Pescatores," we note that Frank and Evan were charged with second-degree conspiracy to commit theft by deception, second-degree conspiracy to commit insurance fraud, and first-degree conspiracy to commit financial facilitation of a criminal activity. Janice was also charged with first-degree conspiracy. Pursuant to N.J.S.A. 2C:5-2:

15

A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

Accordingly, as the State alleged that defendants were acting collectively to engage in a conspiracy to commit various offenses; the State's references to defendants together with respect to their joint actions were appropriate, and not improper.

Further, the State presented sufficient evidence to support each of the charges against Evan and Frank. As detailed above, the State presented evidence at the grand jury proceeding that Evan, a licensed insurance broker, signed the eighteen insurance applications, certifying that the information represented therein was true and accurate. The State demonstrated that the applications contained material misrepresentations regarding whether the premiums would be paid by third-party financing, and whether the insureds were offered free insurance. The State further presented financial records showing that Evan

received unwarranted commission payments from the insurance companies, and then reimbursed the third-party lenders for the premiums.

Additionally, Brotherston testified that most of the insureds knew Frank first, and he introduced them to Evan "as his son and a life insurance agent." Brotherston's testimony described Frank's close involvement in preparing the insurance applications, and discussing and answering questions about the insurance policies with the insureds. Further, the financial records presented by the State established that on at least two instances, a third-party lender was reimbursed from a bank account jointly owned by Frank and Janice. Accordingly we conclude the State presented sufficient evidence to support each element of the charges against Evan and Frank of conspiracy, financial facilitation of a criminal activity, insurance fraud, and theft by deception.

With respect to Janice's charges, as noted, Brotherston testified that one of the insureds reported that he believed that Frank first discussed the opportunity to obtain life insurance while "having dinner or at the Pescatore's house," while Janice was present. The State also presented financial records establishing Janice's receipt of a portion of Evan's commissions, specifically, checks issued from Evan to Janice. Some of the checks contained the word "commissions" and an insured's name. Additional financial records

17

demonstrated that certain third-party lenders were reimbursed from a bank account jointly owned by Evan and Janice, an account jointly owned by Frank and Janice, and, in at least one instance, and an account solely owned by Janice. As such, the State presented sufficient evidence to support each element of the conspiracy and financial facilitation of criminal activity charges against Janice.[2]

To the extent not specifically addressed, defendants' remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded for entry of an order reinstating the indictment and for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] We note that conspiracy may be proven by circumstantial evidence, as "the conduct and words of co-conspirators is generally shrouded in 'silence, furtiveness and secrecy.'" State v. Samuels, 189 N.J. 236, 246 (2007) (quoting State v. Phelps, 96 N.J. 500, 509 (1984)).

A-0472-18T2