NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-1709-18T2
A-1710-18T2

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

FRANK CAMPIONE and
HOWARD KATZ,

     Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

February 24, 2020

APPELLATE DIVISION

Argued October 21, 2019 – Decided February 24, 2020

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-05-0685.

Maura Kathryn Tully, Assistant Prosecutor argued the cause for appellant (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Maura Kathryn Tully, of counsel and on the briefs).

Alton D. Kenney argued the cause for respondent Frank Campione (Starkey, Kelly, Kenneally, Cunningham & Turnbach, attorneys; Alton D. Kenney, on the brief).

Robert A. Honecker, Jr., argued the cause for respondent Howard Katz (Ansell, Grimm and Aaron, PC, attorneys; Robert A. Honecker, Jr., of counsel and on the brief).

Jodi Claire Krugman, Deputy Attorney General, argued the cause for amicus curiae the Attorney General of New Jersey in A-1709-18 (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jodi Claire Krugman, on the brief).

The opinion of the court was delivered by

GEIGER, J.A.D.

On leave granted, plaintiff State of New Jersey appeals from a November 16, 2018 order dismissing all counts of superseding Indictment No. 18-05-0685, in its entirety, against defendants Frank Campione and Howard Katz. The order also denied defendants' motion to sever without prejudice and compelled the State to "provide the [d]efendants with the names and addresses of any and all expert witnesses contacted by the State to review the file for this matter." The State also appeals from a December 19, 2018 order: (1) denying its motion to reconsider and vacate the discovery aspects of the November 16, 2018 order; and (2) ordering the State to "provide the [motion court] with a list of the names, addresses, and any oral or written opinions, and summaries thereof, of all expert witnesses contacted by the State in reference to this case for in camera review by Friday, December 21, 2018." We consolidate the appeals for purposes of issuing a single opinion.

Following our review of the record, we affirm in part and reverse in part the November 16, 2018 order, and reverse the December 19, 2018 order.

## I.

Campione is a licensed physician assistant and the managing member of Acute Medical Housecalls, LLC (Acute). Katz is a licensed physician who began supervising Campione in 2011.

In September 2012, Campione and Katz entered into a written contract whereby Campione would be responsible for the day-to-day operations of Acute, including "perform[ing] H&Ps and procedures for patients in the home setting," "scheduling of patients," "maintaining patient health records/charts," "performing all patient eligibility checks for treatment," "order[ing] and fund[ing] all prescription blanks," and "handl[ing] all calls during and after hours for patients." Katz agreed to "perform the duties of a supervising physician." His responsibilities included "review[ing] and sign[ing] all charts within seven (7) days of visit" and "maintain[ing] licensing for himself and compl[iance] with all rules and regulations as required by the New Jersey Board of Medical Examiners (Board)." Under this contractual arrangement, Campione would receive eighty percent of Acute's net profits and Katz would receive the remaining twenty percent.

The Investigation

A-1709-18T2

The Monmouth County Prosecutor's Office (Prosecutor's Office) investigated Campione and Katz as part of its efforts to stem the proliferation of prescribed opioids that were not medically necessary. According to the State, the investigation revealed the following alleged facts.

In October 2015, the Prosecutor's Office received information from a Middletown Police Department detective that K.M.[1] and an associate were arrested for possession and distribution of prescription medications that were controlled dangerous substances (CDS). K.M. told police he had purchased the prescription blank[2] he used to obtain the CDS from an individual purporting to be a physician inside a McDonald's restaurant in Neptune Township. The prescription blank was recovered by police. It was issued by the office of Frank Campione, RPA-C, Acute Medical Housecalls, LLC, and listed Howard Katz, D.O., as Campione's supervising physician.

Upon receiving this information, the Prosecutor's Office began investigating Campione's medical practices. A subpoena duces tecum was served on New Jersey Division of Consumer Affairs requesting all information

---

[1] We refer to Campione's patients by initials to protect their privacy. See R. 1:38-3(a).

[2] Our references to a "prescription blank" mean a completed and signed prescription form for a prescription legend drug, a drug that can only be procured by prescription.

relating to Campione from the New Jersey Prescription Monitoring Program (NJPMP) from January 1, 2015 through November 5, 2015. Documents revealed that Campione had prescribed medication to 166 patients. K.M. had been prescribed fifteen separate prescriptions for Adderall, Oxycodone, and Xanax between January 1, 2015 and September 21, 2015.

An investigator in the Division of Consumer Affairs Enforcement Bureau advised the detective that Campione had a Physician's Assistant's license that was valid through August 31, 2017. The investigator also informed the detective there appeared to be no affiliation between Campione's practice, Acute, and Katz's medical practice in Colts Neck.

A subpoena duces tecum served on Comcast revealed the identity of the subscriber for the phone number listed on Campione's prescription blank to be Campione's wife, and the address used for the account to be their residence in Brick Township.

On December 2, 2015, as a result of information gathered during the investigation, detectives arrested and charged K.M. with fifteen counts of obtaining controlled dangerous substances by fraud, N.J.S.A. 2C:35-13. During a post-arrest interview, K.M. told the detectives he was referred to "Dr. Frank" by a third-party who he met at a methadone clinic. K.M. described where he met Campione, once inside a McDonald's restaurant in Neptune, and later inside

Campione's vehicle. K.M. also described his interactions with Campione, including the examinations that took place, the prescriptions that he was provided, and how much he paid Campione each time.

Detectives had K.M. call Campione and set up a controlled buy. Campione instructed K.M. to meet him at the Monmouth Mall the following day. The next day, investigators outfitted K.M. with a recording device and drove him to the Monmouth Mall parking lot to meet Campione. Detectives observed the meeting from a distance. When Campione arrived, detectives observed an unknown male, later identified as P.S., exit a vehicle and enter the front passenger seat of Campione's SUV.[3] P.S. eventually exited the vehicle, whereupon Campione drove over to where K.M. was standing.

K.M. entered Campione's SUV and provided him with his previous prescription bottles. In return, Campione provided K.M. with completed prescription blanks to be filled at a pharmacy and K.M. paid Campione $175 in cash. As K.M. attempted to exit the vehicle, Campione told him not to "runaway yet" because Campione was "not just somebody who hands out scripts," and he needed to "do a few things." Although it is unclear from the audio recording

---

[3] NJPMP records revealed that P.S. had received twenty-one prescriptions from Campione between January 2015 and December 2015.

what occurred during the examination, there was mention of a check of K.M.'s breathing, blood pressure, and the amount of oxygen in his blood.[4] The examination lasted less than two minutes. There was also some discussion about whether K.M. was taking his medications at the appropriate times.

K.M. then exited the vehicle. After the completion of the controlled buy, K.M. turned over prescriptions for Xanax, Oxycodone, and Adderall that Campione had just issued.

In December 2015, detectives served a subpoena duces tecum upon Katz for records relating to Acute. According to a detective's affidavit and grand jury testimony, Katz informed the detectives on December 14, 2015 that he was not involved in Acute's day-to-day practice. Katz explained that Campione's "role" was to meet with patients who were confined to their homes, or that were unable to travel to a doctor's office. Katz told the detectives that he does not review the prescription medications Campione prescribed for patients. Katz provided the detectives with an Excel spreadsheet list of "active" patients that he had received from Campione's wife on October 7, 2015. Detectives stated that K.M. was not on the list of active patients. Katz denied knowing who K.M. was, and likewise could not find him listed as a patient. From a later check of the NJPMP, it was

---

[4] Although checking a patient's vital signs may have been appropriate, measuring vital signs alone appear inadequate to substantiate the medical necessity for CDS prescriptions.

learned that twenty-three patients who had received medications from Campione were not on the Excel patient list provided by Katz.

A subpoena duces tecum was also served on TD Bank for financial records pertaining to Campione and Acute from January 1, 2015 to December 20, 2015.

On February 2, 2016, P.S. was arrested and charged with two counts of obtaining CDS by fraud, N.J.S.A. 2C:35-13. According to the detective's affidavit, during his post-arrest interview, P.S. informed detectives about his December 3, 2015 meeting with Campione in his vehicle at the Monmouth Mall parking lot. After Campione checked P.S.'s "basic vital signs," Campione gave P.S. two prescriptions for opioids. P.S. paid Campione $125 and exited the vehicle. P.S. further informed detectives that he had been seeing Campione for a couple years and several of their interactions occurred in the same manner.

P.S. also stated Campione was originally prescribing him Percocet for pain management. According to P.S., however, Campione received a letter from "the Board" that stated Percocet should not be used for chronic pain. As a result, Campione switched the medication from Percocet to Opana (oxymorphone), another opioid pain medication. When P.S. felt Opana was not working well enough, Campione also began prescribing him Hydromorphone. P.S. stated these two medications were what he had been prescribed by Campione "for quite a while."

The Prosecutor's Office applied for a warrant to search Campione's residence, business, and vehicle for evidence of the unlawful practice of medicine, unlawful distribution of CDS, conspiracy to obtain CDS by fraud, and related offenses. A judge granted the search warrants, finding probable cause based on an affidavit that detailed the results of the investigation.

The search warrants were executed on February 18, 2016. On that same day, Campione was arrested and charged with second-degree distribution of prescription medication, N.J.S.A. 2C:35-5(b)(4); third-degree unlawful practice of medicine, N.J.S.A. 2C:21-20; and third-degree conspiracy to obtain a controlled dangerous substance by fraud, N.J.S.A. 2C:5-2(a)(l) and N.J.S.A. 2C:35-13.

Campione moved for a probable cause hearing. After a testimonial hearing, the motion court found that there was probable cause to charge Campione with the crimes contained in the warrant and denied his motion to dismiss the complaints.

Campione subsequently moved to reopen the probable cause hearing pursuant to Rule 1:7-4(b). He also moved to dismiss the complaint pursuant to Rule 3:25-3, claiming there was an unreasonable delay in presenting the charges to a grand jury. On September 15, 2016, the court denied the motions.

Shortly thereafter, Campione filed a renewed motion to dismiss the complaint pursuant to Rule 3:25-3. The court denied the motion as moot after being informed that Campione intended to testify before the grand jury.

The First Indictment

On March 16, 2017, a Monmouth County Grand Jury returned Indictment No. 17-03-0313 charging Campione with a single count of third-degree unlawful practice of medicine, N.J.S.A. 2C:21-20. Both Campione and Katz testified before the grand jury. Notably, Katz was not indicted by the grand jury.

Campione next moved to dismiss the indictment, contending he was being prosecuted for a "non-crime." On May 25, 2018, the motion court issued an order and forty-four-page written opinion denying the motion. The court found "the State presented sufficient evidence to the grand jury that [Campione] held himself out to some patients as a doctor of medicine, rather than as a physician assistant." The court noted the evidence included a voicemail message left by Campione for K.M., where he "can be heard saying, 'This is Dr. Frank.'" The court also noted the State presented evidence "that other patients believed [Campione] held himself out to be a medical doctor." The grand jury testimony of Detective Hunter Brockriede described statements by three other patients who told detectives that Campione identified himself as a medical doctor. The court determined the State presented "'some evidence' that [Campione] may have held

himself out to patients as a medical doctor, in violation of N.J.S.A. 2C:21-20(c)."

The court further found the State presented "some evidence" to the grand jury that Campione violated N.J.S.A. 2C:21-20(d) by engaging in an activity for which a license is necessary, when he prescribed CDS "without prior consultation with his supervising physician, in violation of N.J.S.A. 45:9-27.19(a)(1)," for non-terminal patients.  The court concluded that "[i]f [Campione] was prescribing [CDS] in violation of the statute, then he was engaging in activity that was outside the scope of his healthcare license."  Thus, it determined the State presented sufficient evidence to demonstrate a violation of N.J.S.A. 45:9-27.19.  The court also found the State presented evidence that Campione prescribed CDS to patients during their first meeting without reviewing their medical records beforehand.

The motion court also rejected Campione's argument that Brockreide misled the grand jury by testifying that, "many patient charts were unsigned." The court noted that N.J.S.A. 45:9-27.18 requires patient charts prepared by a physician's assistant to be countersigned by their supervising physician. Investigators seized medical charts that were not countersigned by Katz during the search of Campione's residence and vehicle.  The court found the charts were not reviewed or countersigned by Katz electronically.

11

The court also rejected Campione's argument that the State did not present exculpatory evidence to the grand jury, claiming investigators did not seize inactive patient files from his residence. The court concluded Campione did not "demonstrate how the prosecutor's presentment of the inactive files would have directly negated [Campione's] guilt and that the files were clearly exculpatory." The court noted the State alleged there were eighty-six patients that Campione had not disclosed to Katz, based on a comparison of the files seized from Katz to the list of patients obtained from the NJPMP and the list Katz provided to law enforcement.

The court further rejected Campione's argument that the State made inaccurate statements about Physician Assistant Licensing Act (PALA), N.J.S.A. 45:9-27.10 to .28, to the grand jury. The court found the instructions given to the grand jury were not inaccurate, much less "blatantly wrong." The court likewise rejected Campione's argument that Brockriede did not answer a grand juror's question regarding the timing of countersigning by a supervising physician.

The Second Indictment

The State subsequently sought a superseding indictment against both Campione and Katz. Brockriede testified during the second grand jury proceeding. He presented the grand jury with the statements of eighteen

individuals who had obtained CDS prescriptions from Campione. The statements were used in support of the State's argument that Campione and Katz had used their involvement in Acute to provide CDS prescriptions, in exchange for cash, without medical justification.

On May 24, 2018, the grand jury returned superseding Indictment No. 18-05-0685. Both Campione and Katz were charged with third-degree conspiracy to commit the crime of unlawful practice of medicine, N.J.S.A. 2C:5-2, N.J.S.A. 2C:2-6, and N.J.S.A. 2C:21-20(a), (c), (d) (count one); third-degree unlawful practice of medicine, N.J.S.A. 2C:21-20(a) (count two); third-degree unlawful practice of medicine, N.J.S.A. 2C:21-20(c) (count three); and third-degree unlawful practice of medicine, N.J.S.A. 2C:21-20(d) (count four).

Only Campione was charged, in the same indictment, with thirteen counts of third-degree distribution and/or dispensation of CDS, N.J.S.A. 2C:35-5(b)(5) (counts five, seven, eight, ten, twelve, thirteen, sixteen, seventeen, twenty, twenty-two, twenty-four, twenty-seven, and twenty-nine); eleven counts of third-degree distribution and/or dispensation of CDS, N.J.S.A. 2C:35-5(b)(13) (counts six, nine, eleven, fourteen, fifteen, eighteen, nineteen, twenty-one, twenty-three, twenty-five, and twenty-six); fourth-degree distribution of CDS, N.J.S.A. 2C:35-5(b)(14) (count twenty-eight); fourth-degree possession of a prohibited weapon or device (hollow point bullets), N.J.S.A. 2C:39-3(f) (count

thirty); and fourth-degree possession of a prohibited weapon or device (brass knuckles), N.J.S.A. 2C:39-3(e) (count thirty-one).[5]

The Dismissal Motion

On August 15, 2018, Katz and Campione separately moved to dismiss the superseding indictment. Following a hearing on October 29, 2018, a different judge issued a November 16, 2018 order and oral decision granting the motion, dismissing the indictment in its entirety as to both defendants. The motion court engaged in the following analysis.

As to the first count charging Campione and Katz with conspiracy to commit the unlawful practice of medicine, the court stated:

> The State alleges the mere fact that the defendants had a written contractual agreement for Acute Medical House Calls LLC shows their intent to enter into a conspiracy. However, creating a limited liability company is not a criminal act. It's more reasonable to assume that the lack of a memorialized business organization infers intent to enter into a criminal conspiracy. Therefore the [c]ourt finds Katz and Campione formed Acute Medical House Calls to establish a legitimate legal business, not to engage in a conspiracy. In fact, it was Campione's company, Katz was a supervising physician and/or independent contractor.
>
> The State also alleges that this agreement combined with Campione prescribing CDS to patients without Katz' oversight could create an inference that

---

[5] For ease of reference, we attach a table setting forth the charges, criminal code citation, and defendant charged for each of the thirty-one counts.

defendants intended to engage in a criminal conspiracy. However, there's evidence that Katz did supervise Campione in his role as a physician assistant in electronically reviewing patients' files every week or discussing the files with Campione on a regular basis. Det. Mazariegos testified that Katz met with Campione at least once a week to review patient files, indicating Katz was supervising Campione to some extent.

During the first Grand Jury proceeding the State called multiple witnesses who testified that they never saw Katz, and that Campione wrote the prescriptions on the first visit without having first reviewed their files. However, Melinda Campione, Campione's wife and office manager[,] submitted a sworn statement noting that she would ask patients medical history questions before Campione or Katz ever received the files. None of these witnesses could have accurately testified to the conversations that Katz and Campione had in reviewing patient files or as to whether or not Katz and Campione actually reviewed their files.

The State misled the Grand Jury, making it seem as though Katz never signed or approved any patient files, specifically referring to the "Katz file" found in Campione's car. However, Campione and Katz rebut the argument for the more reasonable inference that the file was in the car to be transported to Katz for approval. Additionally[,] there's evidence that the number of patients actually receiving CDS from Campione was a small fraction of the patients he saw. If Katz and Campione wished to engage in a criminal conspiracy to profit from the illegal distribution of CDS the number of patients receiving CDS prescriptions would be much higher than the approximately five percent of patients submitted.

Moreover, it's undisputed that Campione administered physical exams to the patients, albeit cursory ones. Campione wrote the prescriptions for his

15

patients and it was up to the patients to go to a pharmacy to actually fill the prescription. The [c]ourt finds, giving the State the benefit of all reasonable inferences, the indictment could not be sustained and there's no sufficient actual or circumstantial evidence to infer that Katz and Campione were engaged in a conspiracy and [c]ount [one] will be dismissed accordingly.

As to counts two, three, and four, charging Campione and Katz with the unlawful practice of medicine, the court stated:

> Katz and Campione cannot be charged under N.J.S.A. 2C:21-20(a), (c) or (d) because both defendants had the proper licensure from the State of New Jersey at the time of the indictment. There's no evidence to suggest that either defendant had suspended or revoked licenses at the time of the indictment or the alleged offenses. Although there's evidence that Katz and Campione may have exceeded the scope of their licenses to some extent, neither were charged under N.J.S.A. 2C:21-20(b) for exceeding the scope of practice permitted by Board order.

As to the alleged violation of PALA by treating patients in personal vehicles, rather than in a traditional medical care setting, the court found the State failed to read PALA in its entirety. The court noted N.J.S.A. 45:9-27.15(a) permits a physician assistant to "practice in all medical care settings, including, but not limited to, a physician's office, a health care facility, an institution, a veteran's home, or private home." The court further noted that two other judges had "previously stated that there was nothing criminal about Campione seeing patients in his vehicle." The court found "there's no law that prevents medical

16                                                                    A-1709-18T2

professionals from seeing patients in a vehicle." The court stated patients are treated in ambulances every day, and "there's no law that distinguishes the use of a vehicle for medical purposes in emergent versus non emergent situations."

Regarding the allegation that Campione unlawfully held himself out as a physician, the court stated:

> The weight of the evidence shows Campione made it clear he was a physician assistant. His scrubs were embroidered with the physician assistant abbreviation, the literature he distributed noted he was a physician assistant, the prescription pads Campione used stated he was a physician assistant, and multiple patients testified they knew Campione was a physician assistant. Though a couple of patients may have referred to Campione as Dr. Campione, his failure to correct them is not enough to say that the held himself out to be a doctor.
>
> Even though one voice mail from [K.M.'s] phone may have stated Campione once referred to himself as Dr. Campione, there's some dispute as to whether Campione actually referred to himself as doctor in the voice mail. The [c]ourt finds this isolated reference is not enough to support the conclusion that he held himself out to be a doctor.[6]

As to Katz's lack of direct supervision of Campione, the court stated:

> There is evidence that Katz may not have supervised Campione to the extent that he should have, and some evidence shows that the appropriate forms may not have been filed with the [Board].

---

[6]  The court reiterated this point in its analysis of the dismissal of counts five through twenty-nine.

However[,] N.J.S.A. 45:9-27.15(b) specifically states that a "violation of any of the conditions of this section shall be deemed to have engaged in professional misconduct." . . . Furthermore, N.J.S.A. 45:9-27.17 states that any supervising physician who allows a physician assistant to practice contrary to the provisions of N.J.S.A. 45:9-27.10 "shall be deemed to have engaged in professional misconduct and shall be subject to disciplinary action by the Board." . . .

If Katz did indeed fail to properly supervise Campione, or if the appropriate notice of employment was not provided to the [Board] then this issue should be resolved according to that statute as a professional misconduct violation, not a criminal violation.

The State also argues Campione violated N.J.A.C. 13:35-2B.12(c) by exceeding the legal restrictions for prescribing controlled dangerous substances. The State contends that Campione prescribed CDS without Katz issuing the initial prescription and without consulting Katz before issuing the prescription.

. . . .

Katz and Campione could have discussed prescribing CDS to their patients via telephone, electronic communication or in person. Just because Campione is required to consult with Katz before prescribing CDS to a patient doesn't mean Katz is required to see every patient before Campione writes a CDS prescription.

The [c]ourt finds these alleged violations to be regulatory in nature, not criminal.

As to Katz's failure to file a "notice of employment" with the Board, the court concluded that "if the appropriate notice of employment was not provided

18

to the [Board] then this issue should be resolved according to [N.J.S.A. 45:9-27.15(b)] as a professional misconduct violation, not a criminal violation."

As to counts five through twenty-nine, charging Campione with various CDS offenses, the court concluded the indictment should be dismissed because of multiple instances where the State did not present evidence to the grand jury. The court described the following examples:

> First, the State presented the case to grand jurors as if Katz and Campione were running an illegal CDS distribution business disguised as Acute Medical House Calls LLC when in fact the number of patients that were on CDS was a small fraction of the practice's overall patient account.
>
> If Katz and Campione were in business to illegally distribute CDS for profit, the number would most certainly be higher. In fact, Campione provided a number of services to patients, including administering influenza vaccinations, seeing elderly housebound patients in their homes and providing healthcare access to those who may not have been able to see a doctor in a formal office setting for lack of insurance.
>
> [K.M. and P.S.], two of the patients referenced by Det. Mazariegos, were prescribed CDS after they had been sent for MRIs by Campione. Both patients had been diagnosed with conditions warranting the prescription of CDS.
>
> Additionally, as Katz noted in his brief, patients obtaining CDS would have to be screened through the prescription monitoring program at a pharmacy. To infer that Katz and Campione were running a for-profit drug distribution business is a gross mischaracterization of the facts. Indeed, review of the

19

prescription monitoring program would have shown if Campione was over-prescribing CDS to individuals.

. . . .

Third, the State led the [g]rand [j]ury to believe that the prescriptions Campione was writing were illegal or invalid. Campione was a licensed physician assistant, he had the ability to prescribe medication to his patients in accordance with the law. Det. Mazariegos concluded that the prescriptions issued by Campione were legitimate, yet this evidence was not presented to the second Grand Jury. No evidence has been proffered to suggest that Campione was writing prescriptions in violation of New Jersey State law or that the prescriptions he wrote were invalid.

Fourth, the State misled the Grand Jury during the second presentation because the Assistant Prosecutor told the Grand Jury they were only considering the matter of State versus Frank Campione. The State never told the Grand Jury that Katz was a target.

Katz was not invited to appear at the second Grand Jury presentation and he doesn't have to be, but nor was his testimony given under oath from the first Grand Jury presentation read to the new Grand Jury. Katz was only considered a target after a Grand Jury posed a question to the Assistant Prosecutor asking whether charges were being considered against him.

Fifth, the State misled the Grand Jury by overly emphasizing the fact that Campione saw some of his patients in a vehicle. By this point the State was well-aware there was nothing criminal about seeing patients inside a vehicle, yet the State still presented the case as though there were something criminal about the location of Campione's practice. As previously noted,

20

there's no statute or regulation that prohibits Campione from examining patients in a vehicle.

The State also misled the Grand Jury by showing the jurors a number of texts that had little to no probative value in the case. One text in particular stated, "[M.] in rehab, won't be home until next week." The jury was left to infer that rehab meant drug rehab, yet this patient was never admitted to any drug rehabilitation facility and was never prescribed any controlled dangerous substances by Katz or Campione. In fact, this patient was in a subacute rehabilitation facility after he was discharged from a hospital. This was a strategic move by the State to mislead the [g]rand [j]ury into thinking that Katz and Campione were in business to supply CDS to drug seeking patients.

Finally, the State consistently misstates Campione's patients were paying for prescriptions. Katz and Campione have consistently stated patients paid for their visits, the outpatient setting, and the examination. Katz and Campione did not provide patients with medication. Patients were required to take their prescriptions to a pharmacy to have them filled in order to obtain any medications. Multiple patients testified they paid a flat fee for their visit regardless of how many prescriptions if any they were given by Campione. There's no evidence to support the statement that Katz and Campione charged their patients for prescriptions.

As to count thirty, which charged Campione with unlawful possession of hollow point bullets, and count thirty-one, which charged Campione with unlawful possession of brass knuckles, the court stated:

No evidence of the hollow point bullets or the brass knuckles was presented to the first Grand Jury. However, the evidence was presented to the second

> Grand Jury after the rejection of the global settlement offer. The State was aware of the bullets and the brass knuckles during the first Grand Jury proceeding yet did not present this evidence.
>
> Based on our Supreme Court's holding in State v. Gregory, 66 N.J. 510 (1975), the State was required to present evidence of the hollow point bullets and the brass knuckles at the first Grand Jury proceeding because the State was aware of Campione's possession of those items at the time of the proceeding. Accordingly, [c]ounts [thirty] and [thirty-one] have to be dismissed.

Campione then orally moved to compel the State to provide the names and addresses of any additional experts the State had asked to review the file in this matter. Over the State's objection, the court granted the motion, and ordered the State to "provide the [d]efendants with the names and addresses of any and all expert witnesses contacted by the State to review the file for this matter." The court concluded it was reasonable to require the State to identify the experts it consulted with because if the State were to successfully appeal from the dismissal, the defense "would conceivably need to get their own expert. And they certainly don't want to contact somebody that [the State had] contacted."

The Reconsideration and Discovery Issues

The State moved for reconsideration of the November 16, 2018 order regarding the additional expert discovery, contending the discovery issue was moot due to the dismissal of the indictment. Alternatively, it argued that even

if not moot, defendants were not entitled to such discovery. Following a hearing on December 17, 2018, the motion court orally ruled that the discovery issue was not moot because the State intended to appeal the dismissal of the indictment and the State was proceeding with civil forfeiture action against the property seized from Campione. The court further stated:

> Rule 3:13-3(b) governs post-indictment discovery. The comments to the rule state the rule requires discovery to defendant respecting proposed expert witnesses in general in the same manner as is provided in the Civil practice.
>
> The [c]ivil counterpart is Rule 4:10-2(d)(3). That rule states a party may discover[] facts known or opinions held by an expert other than the expert who is conducting an examination pursuant to Rule 4:19 who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and it was not expected to be called as a witness for trial, only upon the showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means.

The court then engaged in a Brady[7] analysis, concluding since "the State received information for a potential expert witness exculpating defendants, the State had a duty under Brady to turn that information over to defendants as a matter of due process." The court found it necessary to undertake an in camera

---

[7] Brady v. Maryland, 373 U.S. 83 (1963).

A-1709-18T2

review of the names, addresses, reports, and opinions of the expert witnesses contacted by the State in order to determine whether a <u>Brady</u> violation occurred.

In response to the State's argument, that discovery of its experts was moot due to the dismissal of the indictment, the court stated:

> Here, the defendant Campione had his license indefinitely suspended by the Board . . . and has a case pending there. His license will not be reinstated until this criminal matter is resolved apparently.
>
> As long as this case is possibly being appealed the issue [of the identity and findings of the consulting expert] is not moot. Moreover, as the State also has forfeiture proceedings going forward and they are simply not dismissing those, then it is not moot.
>
> Should the State not decide to appeal then the discovery issue would then be moot and the criminal indictment would remain dismissed.

In response to defense counsel's request for additional discovery regarding potential experts, the court issued a December 19, 2018 order requiring the State to "provide the [c]ourt with a list of the names, addresses, and any oral or written opinions, and summaries thereof, of all expert witnesses contacted by the State in reference to this case for in camera review."

The Board's Civil Proceedings and the Consent Order

In February 2016, the Board brought administrative proceedings against Campione "upon receipt of information that [Campione] was suspected of engaging in the indiscriminate prescribing of [CDS], including the prescribing

A-1709-18T2

of CDS without legitimate medical purpose, in violation of N.J.A.C. 13:45H-7.4 and that [Campione] may have been practicing contrary to the provisions of [PALA]." Campione consented to the temporary suspension of his physician assistant license. On March 31, 2016, the Board entered an interim consent order (interim order) suspending Campione's physician assistant license pending further order of the Board and his CDS registration pending further order of the Director of the Division of Consumer Affairs. The interim order directed that Campione "immediately cease and desist from prescribing or dispensing medications and from practicing as a physician assistant." The interim order further provided: "[Campione] understands that this Interim Consent Order is independent of, and not in lieu of, proceedings on behalf or by the DEA, and further agrees that resolution of any pending DEA matters will not resolve any matter which has, or could, be brought before the Board or the Director." The parties stipulated that entry of the order was "without admission of any wrongdoing by [Campione]."

On March 27, 2019, Campione appeared before a Preliminary Evaluation Committee of the Board to discuss the pending investigation. Campione subsequently agreed to the entry of a September 24, 2019 consent order (consent order) that, in pertinent part: (1) suspended Campione's physician assistant license and CDS registration for a period of three years, retroactive to March

31, 2016; (2) required Campione to successfully complete Board-approved ethics, HIPAA, recordkeeping documentation, and CDS prescribing courses; (3) prohibited Campione from prescribing CDS until he successfully completed the CDS prescribing course; (4) limited Campione's practice "to meeting with and treating patients in a traditional medical setting such as a doctor's office, clinic, hospital or urgent care center" and prohibited "meeting with and treating patients and/or otherwise practicing outside of such a traditional, physical office location, including, but not limited to, mobile settings, in-home visits, nursing home facilities, assisted living facilities and private residences"; (5) required Campione to be supervised by a physician who had been pre-approved by the Board, and who must co-sign all of Campione's medical records and approve all prescriptions provided to patients; and (6) rendered Campione responsible for the costs and fees of the Board's investigation, totaling $48,837.94. The costs and fees are stayed unless and until Campione is found in violation of the terms of the consent order, at which time they shall become due and owing.

Notably, the consent order further states:

> 10. The entry of this Order is without prejudice to further action, investigation, and prosecution by this Board, the Attorney General, the Drug Control Unit, the Director of the Division of Consumer Affairs, or any other law enforcement entities based upon [Campione's] conduct prior or subsequent to entry of this Order and not addressed by the terms of this Order.

11. The Board reserves the right to vacate this Order and initiate further action against [Campione's] license and CDS Registration in the event the dismissed Superseding Indictment against [Campione] referenced above is reinstated at any time and a resolution of the criminal matter results in a conviction and/or admission of guilt to any of the charges contained therein.

The consent order concluded the Board's investigation of Campione, subject to reactivation in the event the superseding indictment was reinstated, and the criminal proceedings resulted in a conviction or admission of guilt.

The State's Appeal

The State appealed from both the November 16, 2018 and December 19, 2018 court orders. We granted the State's application to stay the December 19, 2018 order. These appeals are advanced by the County Prosecutor. We permitted the Attorney General to appear as an amicus, and he elected to have a Deputy Attorney General in the Division of Law do so.

The State raises the following points on appeal:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION AND MISAPPLIED THE LAW IN DISMISSING COUNTS 1 THROUGH 29 OF THE INDICTMENT AS THE STATE PRESENTED MORE THAN SUFFICIENT EVIDENCE TO THE GRAND JURY THAT DEFENDANTS COMMITTED SUCH CRIMINAL OFFENSES.

A. Standard of Review.

27

B. The Lower Court Erred in Ruling That Defendants' Actions Could at Most Constitute Administrative Violations, Not Criminal Offenses.

C. The Evidence of Defendants' Conduct in Violating the PALA as Presented to the Grand Jury Demonstrates a Prima Facie Case of Unlawful Practice of Medicine in Violation of N.J.S.A. 2C:21-20a and 20d. The Lower Court Abused Its Discretion and Misapplied the Law in Dismissing Counts 2 and 4.

    1. Defendants Violated the PALA by Campione Treating Patients in a Non-Medical Care Setting.

    2. Defendants Violated the PALA by Campione Treating Patients and Prescribing CDS Without Appropriate Supervision by Katz, and by Failing to File the Required Notice of Employment With the State.

D. The Evidence of Defendants' Conduct as Presented to the Grand Jury Demonstrates a Prima Facie Case of Unlawful Practice of Medicine in Violation of N.J.S.A. 2C:21-20c, as Defendant Campione Unlawfully Held Himself Out as a Licensed Physician to Numerous Patients. The Lower Court Abused its Discretion in Dismissing Count 3.

E. The State Presented a Prima Facie Case of Conspiracy Between Campione and Katz. The Lower Court Abused Its Discretion is Dismissing Count 1.

F. The State Presented a Prima Facie Case of Numerous Instances of Unlawful CDS

28

Distribution and/or Dispensation by Campione. The Lower Court Abused Its Discretion and Misapplied the Law in Dismissing Counts 5 through 29.

POINT II

UNDER STATE V. HOGAN, 144 N.J. 216 (1996), THE STATE HAS NO OBLIGATION TO PROVIDE NON-EXCLUPATORY EVIDENCE TO THE GRAND JURY, NOR WAS ITS PRESENTATION IN ANY WAY MISLEADING.

A. The Lower Court Improperly Expanded the Duties of the Prosecutor as Set Forth in State v. Hogan, 144 N.J. 216 (1996).

B. The State Did Not Mislead the Grand Jury.

POINT III

THE LOWER COURT ABUSED ITS DISCRETION AND MISAPPLIED THE LAW IN DISMISSING COUNTS 30 AND 31. THE STATE HAD NO OBLIGATION TO PRESENT EVIDENCE OF DEFENDANT CAMPIONE'S POSSESSION OF PROHIBITED WEAPONS TO THE FIRST GRAND JURY.

POINT IV

THE LOWER COURT ABUSED ITS DISCRETION BY ORDERING POST-DISMISSAL DISCOVERY.

A. The Lower Court Abused Its Discretion in Ordering Post-Dismissal Discovery as a Case in Controversy No Longer Existed.

29

B.  The Law Does Not Entitle Defendants to the
Discovery They Seek.

## II.

"No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases" not applicable here. N.J. Const. art. I, ¶ 8.  "[T]he grand jury is asked to determine whether 'a basis exists for subjecting the accused to a trial.'"  State v. Hogan, 144 N.J. 216, 227 (1996) (quoting Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487 (1971)). "Equally significant is its responsibility to 'protect[] the innocent from unfounded prosecution.'"  Id. at 228 (alteration in original) (quoting State v. Murphy, 110 N.J. 20, 29 (1988)).

An indictment also "inform[s] the defendant of the offense charged against him, so that he may adequately prepare his defense."  State v. Dorn, 233 N.J. 81, 93 (2018) (alteration in original) (quoting State v. LeFurge, 101 N.J. 404, 415 (1986)).  Accordingly, an "indictment must allege all the essential facts of the crime."  Ibid. (quoting LeFurge, 101 N.J. at 418).  Therefore, "the State must present proof of every element of an offense to the grand jury and specify those elements in the indictment."  Id. at 93-94 (quoting State v. Fortin, 178 N.J. 540, 633 (2004)).

"While acknowledging the significance of the grand jury's role in our criminal justice system, [our Supreme] Court has recognized the grand jury's

independence and has expressed a reluctance to intervene in the indictment process." Hogan, 144 N.J. at 228. To that end, our review of the dismissal of an indictment is guided by the following well-established principles:

> An indictment is presumed valid and should only be dismissed if it is manifestly deficient or palpably defective. A motion to dismiss is addressed to the discretion of the trial court and that discretion should not be exercised except for the clearest and plainest ground.
>
> At the grand jury stage, the State is not required to present enough evidence to sustain a conviction. As long as the State presents some evidence establishing each element of the crime to make out a prima facie case, a trial court should not dismiss an indictment. In a nutshell, a court examining a grand jury record should determine whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it.
>
> [State v. Feliciano, 224 N.J. 351, 380-81 (2016) (citations omitted).]

"We generally review a trial court's decision to dismiss an indictment under the deferential abuse of discretion standard." State v. Twiggs, 233 N.J. 513, 532 (2018) (citing Hogan, 144 N.J. at 229). When a decision to dismiss hinges on a purely legal question, however, our review is de novo and we need not defer to the motion court's interpretations. Ibid. (citing State v. S.B., 230 N.J. 62, 67 (2017)).

## III.

Guided by these principles, we review the dismissal of all thirty-one counts of the superseding indictment as to both defendants.

Count One:  Conspiracy to Commit the Unlawful Practice of Medicine

The State relied on the Acute contract in conjunction with Campione's prescribing CDS without Katz's oversight in support of its allegation that Campione and Katz conspired to engage in the unlawful practice of medicine. The State contends that such a violation of PALA provides the basis for criminal liability.  We are unpersuaded by this argument.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge."  State v. Samuels, 189 N.J. 236, 245 (2007).  "It is the agreement that is pivotal."  Id. at 246 (citation omitted).  To sustain a charge of conspiracy the State must demonstrate an "overt act."  N.J.S.A. 2C:5-2(d).  Here, the superseding indictment listed five overt acts that it alleged were contrary to N.J.S.A. 2C:5-2, N.J.S.A. 2C:2-6, and N.J.S.A. 2C:21-20(a), (c), (d) (relating to the unlawful practice of medicine).  At its core, the State's listed overt acts indicate Campione and Katz conspired to violate PALA due to: (1) Katz's inadequate supervision of Campione; and (2) their failure to file the mandatory "notice of employment" required prior to 2016.

In order to be guilty of conspiracy, a person must, "with the purpose of promoting of facilitating its commission, agree with another person to "engage in conduct which constitutes such <u>crime</u> or an attempt to commit such <u>crime</u>." N.J.S.A. 2C:5-2(a) (emphasis added). An "agreement to commit a specific crime is at the heart" of the conspiracy statute. <u>State v. Samuels</u>, 189 N.J. 236, 245 (2007). A conspiracy requires an "actual agreement [with another] for the commission of the substantive crime." <u>State v. Kamienski</u>, 254 N.J. Super. 75, 93 (App. Div. 1992). An agreement to violate civil statutes or regulations is not a crime.

Contrary to the State's arguments, we conclude that a violation of PALA is not criminal. PALA explicitly states "[a]ny physician assistant who practices in violation of any of the conditions specified in subsection a. of this section shall be deemed to have engaged in professional misconduct." N.J.S.A. 45:9-27.15(b). Such professional misconduct violations are resolved by the Board. N.J.S.A. 45:9-27.15(b); N.J.S.A. 45:9-27.17(b). The statutory provisions and related regulations authorize the Board to suspend or revoke a physician assistant license, but do not subject a physician assistant or a physician to criminal sanctions. Indeed, Campione ultimately received a three-year suspension of his physician assistant license. He is also responsible for costs

and fees if he violates the consent order. These are civil penalties, not criminal sanctions.

As we recently explained in State v. Saad, ___ N.J. Super. ___ (App. Div. 2019):

> In addition, we do not accept the premise that the elements of a crime can be defined by an administrative regulation, which can be amended or repealed by [the Board] without involvement of the Legislature. Moreover, interpreting the statute to incorporate the regulation would introduce ambiguity as to which acts constitute criminal behavior, raising serious concerns regarding notice.
>
> [Slip op. at 12.]

Accordingly, an agreement to promote or facilitate a violation of PALA is not a criminal conspiracy.

While the State presented enough evidence to the grand jury showing Campione violated N.J.S.A. 2C:21-20(c) by knowingly holding himself out as a person eligible to practice medicine, the record does not support the State's theory that Katz and Campione conspired to make patients believe Campione was a medical doctor. In addition, there is insufficient evidence that Campione violated N.J.S.A. 2C:21-20(a) or (d) to impute Campione's alleged unlawful practice of medicine to Katz. For these reasons, we affirm the dismissal of count one with prejudice.

Counts Two, Three, and Four:  Unlawful Practice of Medicine

PALA provides "[a] physician assistant may practice in all medical care settings, including, but not limited to, a physician's office, a health care facility, an institution, a veterans' home, or a private home."  N.J.S.A. 45:9-27.15(a). The State argues that a personal vehicle is not a "medical care setting" within the meaning of PALA.  Conversely, Campione argues the statute does not expressly prohibit a physician assistant from visiting, treating and prescribing medications in locations determined by the physician assistant and his patients.

Amicus Attorney General of New Jersey disagrees with both positions. Instead, the Attorney General notes "[f]rom the inception of the PALA, there were, and continue to be, significant limitations on where and how a physician assistant is permitted to practice."  Although the Attorney General recognizes the language of the statute suggests a broad legislative intent for interpretation of "medical care settings," the examples provided by the Legislature reflect traditional medical care settings.  Accordingly, the Attorney General suggests "it does not necessarily follow that a personal vehicle is an appropriate setting to provide medical care in all circumstances."

The Attorney General goes on to state:

> [F]actors that may be considered include [(1)] whether
> the physician assistant was practicing within his scope
> of practice and under appropriate supervision, [(2)] the
> nature of the patient's condition, and [(3)] whether the

35

setting would provide sufficient space and opportunity to examine the patient in an appropriate fashion. Also to be considered is [(4)] whether the setting will permit the ability to protect patient privacy for the examination and possible treatment, [(5)] whether patient records can be appropriately made and maintained, and [(6)] whether the physician assistant has the ability to consult with the supervising physician, if needed. Any emergent needs of the patient and proximity to emergency services would also be relevant.

[(Footnote omitted).]

The Attorney General concludes that "whether a location is an appropriate 'medical care setting' is fact-sensitive."

The motion court determined that Campione did not violate PALA by examining and prescribing medications for patients while in a vehicle rather than a medical care setting. It further determined that examining and treating patients in a vehicle is not a criminal act. The court noted that patients are routinely treated in ambulances, residences, and other non-medical settings.

Counts two and four allege Campione and Katz engaged in the unlawful practice of medicine by failing to have Campione practice "under the direct supervision of a physician" and failing to provide the appropriate notice of Campione's employment with the Board, in violation of N.J.S.A. 45:9-

27.15(a)(1) and (3).[8]  Campione and Katz were indicted under N.J.S.A. 2C:21-20(a) and (d).  Campione was also indicted for violation of N.J.S.A. 2C:21-20(c).  Both provisions state:

> A person is guilty of a crime of the third degree if he knowingly does not possess a license or permit to practice medicine and surgery or podiatric medicine, or knowingly has had the license or permit suspended, revoked or otherwise limited by an order entered by the [Board], and he:
>
> a. engages in that practice;
>
>    . . . .
>
> c. holds himself out to the public or any person as being eligible to engage in that practice;
>
> d. engages in any activity for which such license or permit is a necessary prerequisite, including, but not limited to, the ordering of controlled dangerous substances or prescription legend drugs from a distributor or manufacturer[.]

The State acknowledges that at all relevant times Campione was a licensed physician assistant and Katz was a licensed physician.  Neither was an imposter.

At the time Campione wrote the prescriptions in question his license allowed him to do so, subject to proper authorization by a "supervising physician."  N.J.S.A. 45:9-27.19(a)(1).  He was registered to prescribe CDS.

---

[8]  N.J.S.A. 45:9-27.15(a)(3) was subsequently deleted pursuant to P.L. 2015, c. 224.  It was in effect when Campione and Katz are alleged to have committed the crimes presented in superseding Indictment No. 18-05-0685.

His license and registration had not been suspended or revoked, nor had it been "limited by an order entered by the [Board]." N.J.S.A. 2C:21-20. Thus, Campione was licensed and registered to prescribe CDS. At no time was Katz's license suspended.

The motion judge concluded that a physician assistant who violates PALA is subject to administrative penalties, not criminal sanctions. He further concluded that defendants did not violate N.J.S.A. 45:9-27.15(a)(1) and (3). We agree.

As previously noted, violation of PALA by a physician assistant is deemed professional misconduct. Similarly, "[a]ny physician who permits a physician assistant under the physician's supervision to practice contrary to the provisions of [N.J.S.A. 45:9-27.10 to .28] shall be deemed to have engaged in professional misconduct . . . and shall be subject to disciplinary action by the board." N.J.S.A. 45:9-27.17(b). Based upon PALA's plain language, we conclude the Legislature intended PALA violations by licensed practitioners to be resolved by the Board through civil penalties, not criminal prosecution.[9]

---

[9] We view the violation of PALA by an unlicensed physician assistant differently because an unlicensed physician assistant is not permitted to prescribe medication. See N.J.S.A. 2C:21-20(a) and (d) (criminalizing such conduct).

In the circumstances presented here, Campione's alleged failure to practice "under the direct supervision of a physician" and the failure to provide notice of his employment to the Board involve professional misconduct, not criminal acts. Similarly, Katz's alleged failure to supervise Campione rendered him potentially liable for civil penalties, not criminal prosecution. Accordingly, the motion court properly dismissed counts two and four as to both defendants. The dismissal of counts two and four is with prejudice.

Count three alleges Campione unlawfully engaged in the practice of medicine by repeatedly holding himself out as a physician, in violation of N.J.S.A. 2C:21-20(c). The motion judge acknowledged a question of fact existed as to whether Campione held himself out as a medical doctor. Here, the State presented "some evidence" to the grand jury that Campione presented himself as a physician to several patients by referring to himself as a medical doctor. The State presented the grand jury with at least "'some evidence' as to each element of a prima facie case." State v. Bennett, 194 N.J. Super. 231, 234 (1984) (quoting State v. Donovan, 129 N.J.L. 478, 483 (Sup. Ct. 1943)). We reverse the dismissal of count three as to Campione.

The State presented no evidence to the grand jury that Katz participated in Campione's alleged act of improperly holding himself out as a physician to patients. We therefore affirm the dismissal with prejudice of count three as to Katz.

39

Counts Five through Twenty-Nine:  Distribution of CDS

Counts five through twenty-seven and twenty-nine charge Campione with third-degree distribution or dispensation of CDS; count twenty-eight charges him with fourth-degree distribution of CDS.  He argued "[d]espite the absence of any clearly exculpatory evidence," and without providing a fact-specific analysis of each count, the motion judge dismissed each of the CDS distribution counts because of "multiple instances where the State did not present evidence to the Grand Jury," resulting in the grand jury receiving "a distorted version of the facts."

The motion court based his ruling on the following aspects of the testimony presented by the State to the grand jury:  (1) presenting the case as if Katz and Campione were running an illegal CDS distribution business when the number of patients prescribed CDS was only a small fraction of their patients; (2) repeatedly referring to Campione as a doctor to mislead the grand jury that he held himself out as a physician despite the weight of the evidence showing Campione made it clear he was a physician assistant; (3) leading the grand jury to believe that the CDS prescriptions were illegal or invalid despite Campione being a licensed physician assistant who was authorized to prescribe CDS; (4) overly emphasizing that Campione saw some of his patients in a vehicle; (5) showing the grand jury text messages that were misleading and had no probative value; and (6) consistently misstating that Campione's patients were paying for prescriptions rather than a flat

fee for visits and examinations in an outpatient setting, regardless of the quantity of prescriptions issued. The motion court found the State presented no evidence that Campione wrote illegal or invalid prescriptions. The court also found it significant that Campione "did not provide patients with medication." Instead, "[p]atients were required to take their prescriptions to a pharmacy to have them filled in order to obtain any medications."

The following principles inform our review of the dismissal of the distribution of CDS charges. 'The grand jury's role is not to weigh evidence presented by each party, but rather to investigate potential defendants and decide whether a criminal proceeding should be commenced." Hogan, 144 N.J. at 235. "Credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury." Ibid.

"In seeking an indictment, the prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime." Id. at 236. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated." Id. at 235 (quoting United States v. Calandra, 414 U.S. 338, 343 (1974)). Therefore, prosecutors are generally not required to "provide the grand jury with evidence on behalf of the accused." Ibid. However, the State may not "deceive the grand jury or present its evidence in a way that is tantamount to telling the grand jury a 'half-truth.'" Id. at 236.

Nevertheless, because grand jury proceedings are non-adversarial, "incomplete or imprecise legal interpretations [by the prosecutor] will not warrant dismissal of the indictment."  State v. Laws, 262 N.J. Super. 551, 562 (App. Div. 1993) (citation omitted).  Moreover, "the conduct of a prosecutor should not warrant dismissal unless it clearly invades the grand jury's decision-making function." Ibid. (citing State v. Schamberg, 146 N.J. Super. 559, 564 (App. Div. 1977)).

Two factors should be considered in evaluating whether to dismiss counts of an indictment due to failure to present exculpatory evidence to the grand jury: (1) does the evidence directly negate guilt; and (2) is it "clearly exculpatory." Hogan, 144 N.J. at 237.  "[O]nly in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury constitute grounds for challenging an indictment."  Id. at 239.

A licensed physician or physician assistant who is registered to prescribe CDS is not exempt from criminal prosecution for prescribing medically unnecessary CDS.  State v. Vaccaro, 142 N.J. Super. 167, 172 (App. Div. 1976). As we explained in Vaccaro:

> A physician's license and registration authorizes him to dispense controlled dangerous substances, but the statute makes it clear that he is immune from criminal liability when he dispenses the same "in good faith . . . in the course of his professional practice only." If he engages in dispensing or selling such drugs beyond the necessities of the good faith practice of his profession, he is no less a 'pusher' of drugs—a

criminal—than a layman unadorned by the trappings of a license or registration.  See United States v. Moore, 423 U.S. 77 (1975), for cases involving analogous federal statute.

. . . .

A physician who is honest and ethical, and dispenses the prohibited drugs in a good faith effort to treat and cure patients, has no fear of the criminal sanctions of the statute. However, his mere status as a licensed physician who has been properly registered as a dispenser of the prohibited drugs does not give him the blanket right to abuse his authority and profession by dispensing drugs without relation to his sworn professional obligations.  See United States v. Moore; United States v. Doremus, 249 U.S. 86 (1919); Webb v. United States, 249 U.S. 96 (1919); Commonwealth v. Miller, 282 N.E.2d 394 (Sup. Jud. Ct. 1972); State v. Jacobs, 503 P.2d 826 (Sup. Ct. 1972).

[Id. at 173-74.]

New Jersey physicians have been criminally prosecuted as well as administratively penalized for prescribing unnecessary CDS.  Indeed, physicians are regularly investigated by the DEA and prosecuted in federal court for prescribing CDS that is not medically necessary.[10]  The fact they were licensed

---

[10]  According to one study, 257 criminal cases were initiated against physicians for drug trafficking, selling, illegally distributing, and racketeering, from 1998 through 2006.  Donald M. Goldenbaum, et al., Physicians Charged with Opioid Analgesic-Prescribing Offenses, 9 Am. Acad. of Pain Med. 737, 744 tbl. 4 (2008).  Of those physicians, "79.5% pled guilty or no contest to at least one of the criminal charges brought against them."  Id. at 743.  Of those physicians who pled not guilty, 90.6% were found guilty of at least one criminal charge.  Ibid.

physicians did not prevent criminal prosecution.  See, e.g., United States v. Maynard, 278 Fed. Appx. 214, 218 (3d Cir. 2008) ("[P]hysicians are subject to criminal liability 'when their activities fall outside the usual course of professional practice.'" (quoting Moore, 423 U.S. at 124 )); United States v. Tighe, 551 F.2d 18, 21 (3d Cir. 1977) (noting that "by placing a prescription for a controlled substance, issued outside of the usual course of medical practice, in the hands of an ultimate user a physician completes" a criminal act); United States v. Brandenburg, 155 F.2d 110, 111 (3d Cir. 1946) (finding that "under the guise of 'treating' a patient a physician may not by issuing prescriptions make it possible for drugs to be peddled or for known addicts merely to satisfy their craving" (citing United States v. Behrman, 258 U.S. 280, 287 (1922))).

Accordingly, we reject Campione's argument that he cannot be guilty of distribution of CDS because he was a licensed physician assistant, who was registered to prescribe CDS to patients.  This, however, does not end our inquiry.

Although Campione was permitted to prescribe CDS, he may only do so in good faith when the CDS is medically necessary and appropriate.  Vaccaro, 142 N.J. Super. at 173.  CDS prescriptions issued to substance abusing patients who do not have a legitimate medical need for such medication subjects the physician assistant to potential criminal prosecution and conviction. Determination of the medical necessity and appropriateness of the prescription

is a fact question to be considered by the grand and petit jurors. An indicted charge should not be dismissed if there is "some evidence" that the CDS prescription was not issued in good faith because it was medically unnecessary or inappropriate.

In addition to his own testimony, Brockriede presented the statements of eighteen patients, K.M., P.S., P.J., M.M., A.L., N.H., B.H., J.M., S.Q., A.M., B.S., J.B., E.U., M.H., P.A., D.H., D.D., and C.M., to the grand jury. The State also presented text messages between Campione and his wife and other circumstantial evidence. Notably, the State did not present any expert witnesses or expert reports addressing the lack of medical necessity of the CDS prescriptions to the grand jury. To be sure, many of the patients' statements described underlying medical conditions causing them to suffer from chronic pain. In several instances, Campione prescribed medications that had been previously prescribed to them by former physicians.

The bulk of the statements presented to the grand jury focused on the location of the examinations, payment for services in cash, the cursory nature of the examinations, the amount Campione charged, and whether the patient was housebound or otherwise prevented from traveling to a medical office. We do not view such facts as evidence that the prescriptions were not medically necessary and, therefore, constituted illegal distribution of CDS within the

meaning of N.J.S.A. 2C:35-5. Many of the patients were seen by Campione in their homes, nearby locations, or in his personal vehicle. House calls are an appropriate "medical care setting" within the meaning of N.J.S.A. 45:9-27.15(a). Similarly, examining patients and prescribing them medication at nearby locations would not provide a basis for criminal prosecution as opposed to potential disciplinary action by the Board. And, as noted by amicus curiae Attorney General of New Jersey, "the statute does not expressly prohibit a personal vehicle from being a 'medical care setting.'" It depends on the circumstances.

Viewing the evidence presented to the grand jury as true and affording the State all reasonable inferences, we conclude there was "some evidence" that the CDS prescriptions issued by Campione to K.M., M.M., B.H. and A.M. were neither medically necessary nor issued in good faith. Consequently, the motion court erred by dismissing counts five, six, nine, thirteen, fourteen, seventeen, and eighteen.

In so ruling, we are not commenting here on what evidence would be admissible at trial regarding the manner and locations of the examinations and treatment performed by Campione in his vehicle, at restaurants, or locations other than his office or the patient's residence.

A-1709-18T2

On the other hand, our careful review of the grand jury testimony and exhibits leads us to conclude insufficient evidence was presented to the grand jury to make out a prima facie case as to counts seven, eight, ten, eleven, twelve, fifteen, sixteen, and nineteen through twenty-nine. Accordingly, the motion court properly dismissed those counts.[11]

By way of example, count seven charged Campione with distribution of CDS to P.S., yet during his statement to investigators, which was read to the grand jury, P.S. stated he provided Campione with his MRI report. He stated he had spinal stenosis and had difficulty walking. He saw Campione for pain management to address severe pain in his arms and legs. P.S. noted that Campione refused to prescribe him Percocet because it was inappropriate for chronic pain. He understood that Campione was a physician assistant, not a medical doctor.

---

[11] In so ruling, we note that the motion judge did not state that the pre-trial dismissal was with prejudice. A pre-trial dismissal does not implicate double jeopardy concerns unless it is "based on a finding of fact relating to the merits of the prosecution," rather than that the evidence presented to the grand jury was insufficient to support an indictment. Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:3-1 (2020). We therefore consider the motion court's dismissal of counts five through twenty-nine to be without prejudice. Our affirmance of the dismissal of any of those counts is likewise without prejudice. The State may seek to re-indict Campione on the dismissed counts by presenting additional evidence to a grand jury, subject to the legal holdings we make here. We express no opinion as to likelihood of success of any such future attempt to re-indict.

Count twenty-six charged Campione with distribution of CDS to P.A. During her statement to investigators, which was read to the grand jury, P.A. stated she had been injured in a serious motor vehicle accident and suffered a fractured leg, anoxia resulting in a lengthy coma, seizures, and a cognitive brain injury. This led to Campione treating her for bed sores. Campione saw P.A. at her residence, had blood work done, checked her vitals, inspected her bed sores, and referred her for physical therapy. In addition to pain medication and Xanax, Campione prescribed sleeping pills, diabetes medication, diuretics, and special shoes for her diabetes. He also ordered additional testing to be performed by nurses.

Count twenty-seven charged Campione with distribution of CDS to D.H. During his statement to investigators, which was read to the grand jury, D.H. stated he was referred to Campione by a pain management physician. He described his medical condition as three herniated discs, a bulging disc, and sciatica. He was treated at his residence. Campione examined and urine tested him each month to make sure he was not selling his medication. In addition to pain medications, Campione prescribed Adderall for ADHD. He noted that his previous psychiatrist had also prescribed Adderall for that condition. When he sought an increase in Oxycodone dosage, Campione refused because he would not over prescribe.

A-1709-18T2

# IV.

Count thirty charges Campione with third-degree possession of hollow point bullets, a prohibited weapon. Count thirty-one charges Campione with fourth-degree possession of metal knuckles, a prohibited weapon. The motion judge dismissed both counts because the State did not present evidence of the hollow point bullets or metal knuckles to the first grand jury, even though it was aware of that evidence. Thus, Campione was not indicted by the first grand jury on those charges. The State presented evidence of the possession of those illegal weapons to the second grand jury, which true billed both counts.

Following State v. Gregory, 66 N.J. 510 (1975), the motion judge applied Rule 3:15-1(b) to implement mandatory joinder. The Court has interpreted the Rule to encompass four factors a defendant must show to gain dismissal of an indictment on this basis: "(1) the multiple offenses are criminal; (2) the offenses are based on the same conduct or arose from the same episode; (3) the appropriate prosecuting officer knew of the offenses at the time the first trial commenced; and (4) the offenses were within the jurisdiction and venue of a single court." State v. Yoskowitz, 116 N.J. 679, 701 (1989) (emphasis added); R. 3:15-1(b). Further, the mandatory joinder rule is codified at N.J.S.A. 2C:1-8(b), which provides in relevant part:

> [A] defendant shall not be subject to separate trials for
> multiple criminal offenses based on the same conduct

> or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court.
>
> [(Emphasis added).]

The judge misapplied the mandatory joinder rule. Here, Campione was not subjected to separate trials. "No disposition on the merits ha[d] taken place." State v. Phillips, 150 N.J. Super. 75, 77 (App. Div. 1977). Other than count one as to Campione, the charges presented to the second grand jury were different than those presented to the first grand jury. Moreover, the second indictment superseded the first. Here, presenting the superseding indictment to the grand jury did not implicate the double jeopardy clause or the mandatory joinder rule. "The mandatory joinder rule deals with offenses, not indictments." State v. Antieri, 180 N.J. Super. 267, 272 (Law Div. 1981), aff'd, 186 N.J. Super. 20 (App. Div. 1982). The State may re-present charges to the grand jury multiple times until it secures an indictment. See State v. Shaw, 455 N.J. Super. 471, 489 (App. Div. 2018) (holding the trial court did not err in refusing to dismiss the indictment returned by a third grand jury where the State presented new and material evidence to the third panel). For these reasons, we reverse the dismissal of counts thirty and thirty-one.

Campione also contends the State failed to recite the entire statute pertaining to metal knuckles when it presented count thirty-one to the grand

jury. He asserts that he had a "lawful purpose" for possessing the metal knuckles because he was a "weapons collector" and the State did not present this lawful defense to the grand jury. We find no merit in this argument. R. 2:11-3(e)(2).

## V.

We next address the post-dismissal discovery ordered by the motion court. The State argues the court abused its discretion by ordering post-dismissal discovery of the identity, opinions, and reports of the experts that it consulted. We agree.

Rule 3:13-3(b)(1)(I) requires the State to provide the following post-indictment discovery:

> [The] names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

As a result of the dismissal of the indictment in its entirety, the criminal action was no longer pending and no trial will occur unless the dismissal is overturned on appeal. Rule 3:13-3(b)(1)(I) does not apply when all charges have been dismissed. Moreover, Campione can renew his application for discovery on remand as to any reinstated counts.

Rule 3:13-3(b)(1)(I) is "parallel" to the civil standard regarding expert testimony. State v. LaBrutto, 114 N.J. 187, 205 (1989); Pressler & Verniero, cmt. 3.2.9 on R. 3:13-3(b)(1). The motion court misapplied the civil standard for discovery of expert witnesses.

> It is the clear intention of [Rule 4:10-2(d)(1)] that it generally apply only to experts who will be testifying at trial, leaving parties free to consult with other experts whose opinion is not discoverable. See Graham v. Gielchinsky, 126 N.J. 361 (1991). A party's consultation with an expert whose identity and opinion is not disclosed to the adversary is privileged, precluding the adversary from himself producing that expert in the absence of exceptional circumstances within the meaning of [Rule 4:10-2(d)(3)].
>
> [Pressler & Verniero, cmt. 5.2.1 on R. 4:10-2(d)(1).]

Further, in the civil context, "a consulting expert is prohibited from testifying for an adversary at trial absent the same 'exceptional circumstances' that would have allowed discovery of that expert's identity and opinion under Rule 4:10-2(d)(3)." Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 301 (2006) (citing Graham, 126 N.J. at 373).

The fact that the State's civil forfeiture action was then still pending when the indictment was dismissed does not change the analysis.[12] The owners of

---

[12] During oral argument before this court, counsel advised that the civil forfeiture action is now settled. Consequently, the issue of discovery that might have been necessary in the forfeiture proceeding is now moot.

52

property sought to be forfeited may seek discovery in the forfeiture action. See State v. 1987 Chevrolet Camaro, 307 N.J. Super. 34, 43-46 (App. Div. 1998) (noting the right to discovery in forfeiture actions and applying discovery enforcement rules).

We likewise conclude that the pendency of license suspension proceedings brought against Campione by the Board, and his related temporary suspension, which will not be fully resolved until the criminal charges are resolved, does not provide a legal basis for ordering the State to provide post-dismissal expert discovery. Campione may seek permitted discovery in the administrative proceeding if those proceedings are reactivated as a result of our decision reinstating certain counts of the indictment. N.J.A.C. 1:1-10.1 to -10.6.

Recent precedent, such as In re Cayuse Corp. LLC, 445 N.J. Super. 80 (App. Div. 2016), does not compel a contrary result. The facts in Cayuse, which involved a challenge to the denial of a retail firearms dealer's license application, are materially distinguishable. Cayuse faced potential adverse consequences on future license applications as a result of the application denial being challenged. Id. at 97. Here, the dismissal of the indictment terminated the criminal case.

## VI.

In sum, we affirm the dismissal with prejudice of counts one, two and four. We affirm the dismissal without prejudice of counts seven, eight, ten,

eleven, twelve, fifteen, sixteen, and nineteen through twenty-nine. We affirm the dismissal with prejudice of all charges against Katz. We reverse the dismissal of counts three (as to Campione), five, six, nine, thirteen, fourteen, seventeen, eighteen, thirty, and thirty-one and remand those counts for further proceedings. We also reverse the orders compelling post-dismissal discovery.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

# TABLE – INDICTMENT NO. 18-05-0685

| Count: | Contrary to N.J.S.A.: | Charging: | Patient: | Appellate Disposition: |
|---|---|---|---|---|
| One **(1)**: third-degree conspiracy | 2C:5-2, 2C:2-6, and 2C:21-20(a), (c), (d) | Campione & Katz | N/A | Dismissed |
| Two **(2)**: third-degree unlawful practice of medicine | 2C:21-20(a) | Campione & Katz | N/A | Dismissed |
| Three **(3)**: third-degree unlawful practice of medicine | 2C:21-20(c) | Campione & Katz | N/A | Reinstated as to Campione/ dismissed as to Katz |
| Four **(4)**: third-degree unlawful practice of medicine | 2C:21-20(d) | Campione & Katz | N/A | Dismissed |
| Five **(5)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | K.M. | Reinstated |
| Six **(6)**: third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | K.M. | Reinstated |
| Seven **(7)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | P.S. | Dismissed |
| Eight **(8)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | P.J. | Dismissed |

A-1709-18T2

| | | | | |
|---|---|---|---|---|
| Nine (9): third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | M.M. | Reinstated |
| Ten (10): third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | A.L. | Dismissed |
| Eleven (11): third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | A.L. | Dismissed |
| Twelve (12): third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | N.H. | Dismissed |
| Thirteen (13): third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | B.H. | Reinstated |
| Fourteen (14): third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | B.H. | Reinstated |
| Fifteen (15): third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | J.M. | Dismissed |
| Sixteen (16): third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | S.Q. | Dismissed |
| Seventeen (17): third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | A.M. | Reinstated |
| Eighteen (18): third- | 2C:35-5(b)(13) | Campione | A.M. | Reinstated |

A-1709-18T2

| | | | | |
|---|---|---|---|---|
| degree distribution of CDS | | | | |
| Nineteen **(19)**: third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | B.S. | Dismissed |
| Twenty **(20)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | J.B. | Dismissed |
| Twenty-One **(21)**: third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | J.B. | Dismissed |
| Twenty-Two **(22)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | E.U. | Dismissed |
| Twenty-Three **(23)**: third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | E.U. | Dismissed |
| Twenty-Four **(24)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | M.H. | Dismissed |
| Twenty-Five **(25)**: third-degree distribution of CDS | 2C:35-5(b)(13) | Campione | M.H. | Dismissed |
| Twenty-Six **(26)**: third-degree | 2C:35-5(b)(13) | Campione | P.A. | Dismissed |

| | | | | |
|---|---|---|---|---|
| distribution of CDS | | | | |
| Twenty-Seven **(27)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | D.H. | Dismissed |
| Twenty-Eight **(28)**: fourth-degree distribution of CDS | 2C:35-5(b)(14) | Campione | D.D. | Dismissed |
| Twenty-Nine **(29)**: third-degree distribution of CDS | 2C:35-5(b)(5) | Campione | C.M. | Dismissed |
| Thirty **(30)**: fourth-degree possession of a prohibited weapon (hollow point bullets) | 2C:39-3(f) | Campione | N/A | Reinstated |
| Thirty-One **(31)**: fourth-degree possession of a prohibited weapon (metal knuckles) | 2C:39-3(e) | Campione | N/A | Reinstated |

A-1709-18T2